(No. 21744.— )

ARTHUR W. ARENTSEN, Defendant in Error, *vs.* THE SHERMAN TOWEL SERVICE CORPORATION *et al.* Plaintiffs in Error.

Opinion filed April 22, 1933.

**328**

MARKHEIM & ALLIE, and SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, (A. R. MILLER, and ISAAC E. FERGUSON, of counsel,) for plaintiffs in error.

BEDERMAN, KLEIN & GRALNEK, (RICHARD R. KLEIN, of counsel,) for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Arthur W. Arentsen, defendant in error, filed in the superior court of Cook county a bill praying for an order directing the defendants thereto, Eugene Byfield and plaintiffs in error, the Sherman Towel Service Corporation, Ernest L. Byfield and Frank W. Bering, to issue and deliver to him a certificate representing twenty-five per cent

of the capital stock of said corporation. The defendants appeared and filed an answer to the bill. The corporation also filed a cross-bill praying that Arentsen be ordered to transfer to the corporation the stock thereof owned by him, in accordance with the terms of a written agreement between the corporation and Arentsen. After Arentsen had filed an answer to the cross-bill and replications had been filed to the answers to the bill and cross-bill the cause was referred to a master in chancery, who took the evidence and by his report recommended a decree dismissing Arentsen's bill for want of equity and granting the prayer of the cross-bill. Objections and exceptions to the master's report were overruled and a decree was entered by the court in accordance with the master's recommendations. The cause was reviewed by the Appellate Court for the First District on writ of error, and that court entered judgment reversing the decree of the superior court and remanding the cause to that court, with directions to enter a decree dismissing the cross-bill for want of equity and granting the prayer of Arentsen's bill. Eugene Byfield died after the decree of the superior court was entered and his death was suggested in the Appellate Court, and the cause proceeded to judgment as to the other defendants in error in that court. This court has allowed the petition for writ of *certiorari* of the Sherman Towel Service Corporation, Ernest L. Byfield and Frank W. Bering.

In the early part of 1927 Arentsen, Eugene and Ernest L. Byfield and Bering entered into negotiations for the formation of a corporation to engage in the business of furnishing to hotels, clubs, apartment houses and other institutions and offices the service of supplying them towels, soap and other articles for their use. An agreement to organize such corporation was made, with the understanding that Arentsen was to be the manager of the business and the necessary capital was to be furnished by the Byfields and Bering. Ernest L. Byfield was president of the Hotel Sher-

man Company. An office was opened in property owned by the hotel company, and an automobile truck, office equipment, stationery, toweling and other material were purchased on the credit of the hotel company. A statement of incorporation was filed with the Secretary of State by Arentsen, Bering and the Byfields, and on May 11, 1927, a certificate of incorporation of the Sherman Towel Service Corporation was issued. The capital stock of the corporation was to consist of ten shares of stock of no par value. The statement of incorporation showed that each of the four incorporators had subscribed for two and one-half shares of stock of the corporation and paid therefor $250, but the evidence shows that no money was paid into the corporation for any of its stock and no stock was actually issued. The Hotel Sherman Company charged the corporation with the cost of the material and equipment purchased by that company for the corporation. The directors of the corporation were Arentsen, Bering and Ernest L. Byfield.

A written contract dated May 2, 1927, was entered into between the corporation and Arentsen. In the contract it is recited that Arentsen is the owner of twenty-five per cent of the capital stock of the corporation and is possessed of particular ability for managing the business of the corporation, and that the corporation desires to employ him as its general manager and that he is willing to be so employed. The first clause of the contract provides that the corporation employs Arentsen as general manager for one year, and from year to year thereafter until the agreement is terminated by action of the board of directors of the corporation, "which termination may take place at any time after the first year of employment hereunder, with or without cause." The second clause of the contract provides that Arentsen enters into the employment of the corporation and agrees to devote his zeal, energy and attention to the affairs of the corporation. The third clause provides that Arentsen shall receive no salary or other com-

pensation for his services to the corporation other than dividends on stock owned by him. By the fourth clause Arentsen agrees to vote or cause his stock to be voted in favor of any and all increases of the capital stock of the corporation that may be proposed from time to time. The fifth clause provides that in case any authorized and un-issued stock of the corporation shall be issued other than as a stock dividend, Arentsen shall have the right for thirty days to subscribe for twenty-five per cent of such stock, and that the corporation, if requested, shall procure for him a loan of money with which to pay for such stock. The sixth clause of the contract, in which the corporation is designated as "the company" and as "the party of the first part," is as follows: "Said Arentsen does hereby agree that he will not sell his stock, or any part thereof, which may be owned by him from time to time, while he is in the employ of the company or after his employment with the company has been terminated, to any person or corporation other than the company or the Hotel Sherman Company, unless and until he has notified the company and the Hotel Sherman Company of his desire to sell said stock and has given the company and/or the Hotel Sherman Company an opportunity to exercise the option hereinafter given by said Arentsen, and said Arentsen does hereby give to said company and/or to Hotel Sherman Company the right and option, for a period of ninety (90) days from the time that he shall cease to be in the employ of the party of the first part, or from the time of his giving notice of his desire to sell his stock or any part thereof, to purchase from him his stock, or any part thereof, in the company, at the book value thereof as the same appears on the books of the party of the first part. In determining book value no allowance is to be made for good will nor for contemplated or future profits upon any contracts between the party of the first part and its customers. Subject to the conditions contained in this paragraph sixth, said book value shall be determined

from an audit made by auditors designated by and meeting the sole approval of the party of the first part and/or Hotel Sherman Company. In the event that the company and/or the Hotel Sherman Company shall not exercise its option within ninety (90) days, as hereinbefore provided, said Arentsen shall have the right to sell his stock, or any part thereof, to any person, partnership or corporation whatsoever, subject, however, to the terms and conditions of this agreement and to the terms and conditions of any voting trust agreement, as hereinafter provided." The seventh clause of the contract provides that Arentsen, when requested by the corporation, shall enter into a voting trust agreement with the Hotel Sherman Company giving to said company the right to have control and to exercise the voting power of all stock in the corporation owned by him as long as he shall remain in the employ of the corporation. The eighth and last clause of the contract provides that all certificates of stock of the corporation shall bear a legend across the face thereof reciting that said certificates and the shares represented thereby are held by their owners subject to the terms and conditions of the contract.

Arentsen after the execution of the contract acted as general manager of the corporation and devoted his time and attention to the affairs and business thereof until September 8, 1928. On September 4, 1928, the board of directors of the company adopted a resolution terminating the employment of Arentsen by the corporation as of September 8, 1928, and notice of the resolution was given to him. At that time the corporation was doing a gross business of from $10,000 to $11,000 monthly. On September 13, 1928, the corporation wrote a letter to Arentsen, which was received by him, in which it stated that the corporation elected to exercise its option to purchase his stock in the corporation as given by the sixth clause of the contract, and requested him to select an auditor to co-operate with the auditor of the corporation in determining the book value of

the shares or interest of Arentsen in the corporation. It was further stated in the letter that if Arentsen did not within three days name an auditor the corporation would proceed to have its auditor make an examination and report and would thereafter tender Arentsen the price for his shares established by such audit. No auditor was named by Arentsen and the corporation employed an accountant to make an audit of its books to determine the book value of Arentsen's interest in the corporation, and on November 20, 1928, wrote to Arentsen notifying him that the audit had been made and that the auditor's report showed that the liabilities of the corporation exceeded its assets by $30,-335.37. In the letter the corporation offered to pay Arentsen $100 for an assignment of all his rights and interests in the stock of the corporation.

The balance sheet of the corporation as of August 31, 1928, as made up by the auditor, showed the following:

*Assets*

| | |
|---|---|
| Accounts receivable . ................................ | $12,826.06 |
| Inventories . ....................................... | 2,180.97 |
| Due from Arentsen.................................. | 1,910.00 |
| Auto trucks, fixtures and equipment................... | 10,109.54 |
| Prepaid insurance and licenses....................... | 271.42 |
| Total assets . .................................. | $27,297.99 |

*Liabilities*

| | |
|---|---|
| Due to Hotel Sherman Company...................... | $56,463.44 |
| Accrued commissions payable........................ | 1,169.92 |
| Total liabilities . ................................ | $57,633.36 |
| Deficit . .......................................... | 30,335.37 |
| | $27,297.99 |

The accountant who made the audit testified, in substance, as follows: The item of "inventories" included all towels, coats, gowns, etc., owned by the corporation which had not been placed in service. In making up the balance sheet no value was assigned to towels, coats, gowns, etc., that had been placed in service. The total cost of such arti-

cles in service on August 31, 1928, was $33,149.46. Of these articles an amount that cost $21,207.27 had been placed in service during the year 1927. Assuming that November, 1927, was "the average date" the merchandise was placed in service and that the towels and garments had a life of three years, its value on August 31, 1928, was $26,083.22. Assuming the articles had an average life of two years their value on said date was $22,549. Assuming the garments had a life of one year and the towels of two years their value was $19,226.35. Assuming an average life of one year for all such merchandise the net value thereof was $11,949.32. Under any of these assumptions the liabilities of the corporation exceeded its assets. The item of $56,463.44 due from the corporation to the Hotel Sherman Company was made up of disbursements for items purchased, charges for laundry service and interest on monthly balances. The total charges made by the hotel company to the corporation for laundry services from the time the corporation started business to August 31, 1928, were $53,821.73. The price charged for flat work for the month of March, 1928, was four cents a pound.

The testimony of a number of witnesses established that it is the usual custom and accounting practice with firms engaged in such business as was conducted by the corporation to charge off the cost of all towels, garments, etc., as soon as they are placed in service. In other words, the custom is to consider as of no value, towels, garments, etc., that have been placed in service. The only witness who testified on the subject stated that the average length of life of a towel in service such as was given by the corporation is less than a year.

The evidence shows that the Hotel Sherman Company charged the corporation for laundry service as follows: For flat work four cents a pound, for coats and garments fifteen cents each, for waitress' uniforms ten cents each, and for caps and collars five cents each. Arentsen testified that

there was no agreement between the hotel company and the corporation as to charges to be made for laundry service except that the work should be done at cost plus a profit, with the understanding that the prices charged should not exceed the "competitive market price." Ernest L. Byfield testified that the hotel company at no time agreed that it would meet competitive prices for laundering flat work. Both he and Eugene Byfield testified that Arentsen agreed and assented to the hotel company charging the corporation four cents a pound for flat work. Ernest L. Byfield further testified that at one time Arentsen protested that the charges of the hotel company were too high, and an adjustment was made and the matter settled to Arentsen's satisfaction. There is testimony as to the prevailing charge for laundry work in Chicago between April, 1927, and September, 1928. Arentsen testified that such charges were, for misses' slip-overs ten cents each, for butchers' frocks ten cents each, and for flat work two cents a pound. He further testified the Church & Hailes Laundry charged two cents a pound for laundering flat work of from 50,000 to 100,000 pounds a month. James M. Nichols, the manager of a laundry, (a witness for Arentsen,) testified that the customary laundry charges where the garments and towels were delivered to and called for at the laundry were, for waiters' and doctors' short coats six cents each, for butchers' frocks twelve cents each, and for flat work in quantities of from 50,000 to 100,000 pounds two and one-half cents a pound.

The following witnesses testified, in substance, for plaintiff in error: Walter W. Hailes, manager of the Church & Hailes Laundry: The laundry did not and could not profitably launder flat work at a charge of two cents a pound. Samuel Levitetz, manager of the Great Western Laundry Company: The usual, customary and reasonable charge for flat work in quantities of 2000 or more pounds a day was three and a half cents a pound and in smaller amounts four

to four and a half cents a pound; that an analysis of the cost of operation of the laundry showed that it just broke even on a charge of four and a half cents a pound for such work. Victor G. Williams, who was engaged in the laundry business in Chicago: The usual, customary and reasonable charge for laundering flat work in quantities was a minimum of four and one-fourth cents a pound.

It is to be noted that the written contract between Arentsen and the corporation is dated May 2, 1927, while the certificate of incorporation of the corporation is dated May 11, 1927. An attorney who represented the corporation in the matter of the preparation and execution of the contract testified that the contract was not executed until after the certificate of incorporation had been issued. While Arentsen testified that the contract was executed on the date which it bears on its face, he does not contend that the contract is invalid or void because the corporation was not in existence at the time the contract was executed. Therefore we need not notice this matter any further but shall assume that the corporation was in existence when the contract was executed.

Arentsen contends that the provision of the sixth clause of the contract by which an option was given to the corporation to buy his stock is unenforceable because the contract is unilateral and not supported by consideration. Where for a valuable consideration an option is given to purchase specific property at a certain price for a stated period of time, and within the time limited the person having the option signifies his intention to exercise the option and purchase the property upon the terms stated, the resulting bilateral contract is governed by the ordinary rules relating to bilateral contracts. (*Guyer* v. *Warren,* 175 Ill. 328; *Macy* v. *Brown,* 326 id. 556; *Hunter* v. *VonBronk,* 333 id. 321; *Anderson* v. *Bills,* 335 id. 524.) A valuable consideration consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or re-

sponsibility given, suffered or undertaken by the other. (*Anderson* v. *Bills, supra.*) By the contract Arentsen was given the right and privilege of managing the affairs and business of the corporation for one year. If by his business ability in the management of the corporation the corporation made a profit he would share therein by virtue of his ownership of one-fourth of the stock of the corporation. On the other hand, the corporation gave up the right for one year to employ anyone other than Arentsen as general manager of the corporation. Therefore it is clear that the contract is not void for want of consideration, and that the right of the corporation to purchase Arentsen's stock is not unenforceable because such right as given by the contract took the form of an option.

Arentsen further contends that under a proper construction of the sixth clause of the contract the corporation was not given an option to buy his stock under any circumstances unless he desired to sell it. There is no ambiguity in the language of the sixth clause of the contract giving to the corporation an option to buy Arentsen's stock. The option is given for a period of ninety days from the time he shall cease to be in the employ of the corporation or from the time of his giving notice of his desire to sell his stock or any part of it. This language clearly means that for ninety days after Arentsen ceased to be in the employ of the corporation it should have the option to buy his stock, and that for ninety days after Arentsen gave notice of his desire to sell his stock the corporation should have the option to buy it, whether or not Arentsen's employment by the corporation had ceased. In other words, by the terms of the sixth clause of the contract the corporation was to have an option to buy Arentsen's stock in either of two events, namely: (1) Upon Arentsen's employment by the corporation being terminated, and (2) upon Arentsen giving notice of his desire to sell his stock. Arentsen's employment with the corporation was terminated, and the cor-

poration, within the time limited by the terms of the option, gave him notice of its election to exercise its option to buy his stock.

It is also contended by Arentsen that in making the audit of the books of the corporation to determine the value of its stock, the towels, garments, etc., of the company that had been placed in service should have been valued and listed as an asset of the corporation. The evidence clearly and conclusively established that it was the usual and accepted accounting practice by companies furnishing service of the kind sold by the corporation, to charge off on the books the full cost price of towels, garments, etc., as soon as they were placed in service and thereafter not carry such articles as an asset of the company. There is no testimony in the record that shows what per cent of articles of the corporation that had been placed in service prior to Arentsen's discharge were towels and what per cent coats, garments, etc. There is no testimony as to the average life of a coat or garment in such service, but the only testimony in the record upon the subject shows that the average life of a towel in such service is less than a year. The audit showed that the liabilities of the corporation exceeded its assets by more than $30,000. The total cost of all towels, garments, etc., placed in service by the corporation prior to Arentsen's discharge was $33,149.46, and of these articles an amount that cost $21,207.27 was placed in service in the year 1927. If it be conceded that in making the audit some value should have been assigned to these articles, it is very apparent from the evidence that after due allowance for depreciation such value would necessarily have been a less sum than $30,000 and would not have been large enough to make the assets of the corporation equal to its liabilities. We deem it sufficient to say, without any discussion of the evidence on that question, that the evidence did not establish that the charges made by the Hotel Sherman Company for laundry services were unreasonably high or greater than the contract be-

tween that company and the corporation for such services specified should be charged for such services. By the terms of the contract, upon the corporation exercising its option to buy Arentsen's stock, the price of such stock for such sale was to be "the book value thereof as the same appears on the books" of the corporation, with no allowance for good will or contemplated or future profits, as determined by an audit of the books of the corporation. The evidence clearly shows that such an audit disclosed the book value of such stock to be nothing, and that the corporation nevertheless offered Arentsen $100 for an assignment of his stock and he refused the offer.

The evidence shows that before the written contract that was signed by the parties was executed several drafts of a proposed contract were made and several conferences were held between the Byfields, Bering and Arentsen, and at these conferences, and in the negotiations resulting in the contract, Arentsen was represented by his attorney. There is not the least evidence tending to show that any fraud, oppression or unfair conduct entered into the making of the contract, and the evidence shows that Arentsen signed the contract willingly, with full knowledge of all its provisions. It is true that a court of equity will not grant specific performance of a contract that is inequitable, unconscionable or unjust. (*Smith* v. *Smith*, 340 Ill. 373.) It is also true, as a general rule, that inadequacy of consideration, exorbitance of price or improvidence of a contract, fairly and understandingly entered into by parties competent to contract, will not, in the absence of fraud, constitute a defense to a bill for specific performance. (*Chicago Title and Trust Co.* v. *Merchants Trust Co.* 329 Ill. 334.) It is the function of courts of equity to enforce rather than to sanction the evasion of contracts, and they are not concerned with the question of the wisdom or folly of contracts between parties competent to contract, where such contracts are made fairly, understandingly, for a con-

sideration and without fraud. (*Keogh* v. *Peck*, 316 Ill. 318.) The contract between Arentsen and the corporation was fairly and understandingly made. Subsequent events proved that the contract was an improvident one on Arentsen's part, but there is no showing, viewed from the situation at the time the contract was made, that it is inequitable, unconscionable or unjust. Since the stock in the corporation was not on the market and the shares had no market value, the contract to sell such stock may be enforced by specific performance. *Hills* v. *McMunn*, 232 Ill. 488; *Smurr* v. *Kamen*, 301 id. 179.

The decree of the superior court is correct under the facts proved and the Appellate Court erred in reversing it. The judgment of the Appellate Court is reversed and the decree of the superior court is affirmed.

*Judgment of Appellate Court reversed.*
*Decree of superior court affirmed.*