**Commercial Products Corporation, an Illinois Corporation, Plaintiff-Appellant, v. Theodore W. Briegel, Sr., Theodore W. Briegel, Jr., All-Steel Equipment, Inc., an Illinois Corporation, and T. W. B. S., a Corporation, Defendants-Appellees.**

Gen. No. 68–10.

Third Judicial District.

November 22, 1968.

Perona & Perona, of Spring Valley, for appellant.

Black, Black & Borden, of Peoria, and McDermott, Will & Emery, of Chicago, for appellees.

CULBERTSON, J.

Plaintiff, Commercial Products Corporation, appeals from a summary judgment which, on the basis of pleadings, depositions, affidavits and counteraffidavits, was entered by the Circuit Court of Henry County in favor of defendants named in a five-count complaint that pleaded multiple causes of action.

On or about January 1, 1964, the defendants Theodore W. Briegel, Sr., and Theodore W. Briegel, Jr., were partners in the Briegel Method Tool Company, and were also the principal shareholders in a corporation styled as the B. M. Fitting Corporation, hereinafter referred to as BMFC. At the time, both the partnership and the corporation were indebted to Stephen Tonchen for a judgment of $200,000, and the Briegels seem to have been preoccupied with the discharge of such obligation. Sometime early in the year, Conrad Dyke, president of the plaintiff Commercial Products, discussed with Briegel, Sr., the possibility of obtaining financing with which to satisfy the judgment. Nothing came of the proposal, however, and on May 16, 1964, Tonchen accepted a note for $204,485.56 signed by the BMFC corporation "and others," which was secured by real and chattel mortgages on corporate property. During August, 1964, the relationship again became critical when Tonchen brought a suit against BMFC for wrongful discharge and lost salary, and exerted a claim for royalties allegedly due him.

Late in August, 1964, the defendant All-Steel Equipment Company, Inc., became interested in the purchase of BMFC and, for a period of two months thereafter, its representatives engaged in discussions and negotiations with the Briegels and their attorneys. On October 20, 1964, a draft of a proposed agreement was prepared, one provision of which was that BMFC would be required to obtain, prior to closing, a release of all of Tonchen's claims. However, on October 26, 1964, Tonchen filed a suit to foreclose his mortgages and the active negotiations of All-Steel came to a halt. During November, 1964,

158

representatives of All-Steel did make inquiries as to the status of the BMFC matter, being told on one occasion that the Briegels were considering a proposition made by Dyke, and on a second that the deal with Dyke was going to be closed.

About the time negotiations with All-Steel came to a standstill, Dyke had lunch with the Briegels and expressed an interest in purchasing BMFC on the same terms proposed by All-Steel. Thereafter, on November 6, 1964, the parties and their attorneys met to discuss the matter, and as a result an offer by the Briegels to sell all their stock in BMFC to the plaintiff (Commercial Products) was drafted and signed by the Briegels on November 9, 1964. The offer contained certain conditions precedent, to be discussed later, one of which required compliance on or before December 1, 1964, and also provided that the closing date was to be on or before December 31, 1964. What occurred on and around December 1, 1964 shall be subsequently set forth. For now, however, it is sufficient to say that those representing the Briegels took the position that the conditions imposed had not been met thus nullifying the offer, while those representing plaintiff believed there had been compliance and continued to make preparations for a December 31, 1964, closing.

On December 17, 1964, Duane P. Benson, one of the BMFC attorneys, met with representatives of All-Steel and advised them that the Briegels were no longer obligated under the offer to plaintiff and were free to negotiate with All-Steel. At the same time, Benson sought to negotiate on the basis of a purchase by All-Steel without need of a release from Tonchen, but was informed that All-Steel would not be interested in a purchase until a release was obtained. In an affidavit filed in opposition to the motions of defendants for summary judgment, Dyke's attorney stated that he and his client had gone to Benson's office on December 31, 1964, for the purpose of

159

closing but were told the deal between the Briegels and plaintiff was off.

During the next three months Dyke and Benson had several meetings and exchanges of correspondence. On the one hand, Dyke adopted the position that the Briegels' offer was binding upon them and sought to suggest various ways in which a final closing could be agreed upon and made; Benson, on the other hand, embraced a position that the offer was not binding, but that the Briegels were willing to hear and consider any new proposal Dyke might have. The exchange terminated, and Dyke did not negotiate further, after Benson wrote on March 3, 1965: "If you have any serious proposal to make to the company, I repeat at this time you should have your attorney draw up a definite offer of purchase."

Late in March, 1965, Benson started direct negotiations with Tonchen to settle the latter's claims, and when success appeared imminent he contacted All-Steel and was assured that the figures employed in All-Steel's proposal of October, 1964, were still firm. On March 30, 1965, the Tonchen matters were cleared up to the apparent satisfaction of all concerned. Subsequently, on April 15, 1965, final negotiations were entered into with All-Steel and the latter purchased BMFC about May 15, 1965.

■■ This action was started by Commercial Products on November 8, 1965, and, as has been noted, was culminated in the trial court with the entry of a summary judgment for the defendants. The purpose of summary judgment procedure is not to try facts, but to determine whether a genuine issue exists as to any material fact which would require a trial (Allen v. Meyer, 14 Ill2d 284, 152 NE2d 576; Welsh v. Centa, 75 Ill App2d 305, 221 NE2d 106), and thus the scope of our review is to determine if the trial court correctly decided there were no such factual issues in this case.

Count I of the complaint proceeds on the theory that the Briegels' offer to sell their stock ripened into an

enforceable contract by virtue of plaintiff's compliance with its conditions within the time limited (see: Keller v. Reed, 347 Ill 645, 180 NE 459; Arentsen v. Sherman Towel Service Corp., 352 Ill 327, 185 NE 822), and prays for specific performance. And it is apparent that Counts II and IV of the complaint must stand or fall with Count I, for each is predicated on the existence of the contract. Specifically, Count II seeks to recover $100,000 in damages from the Briegels for damages and expenses allegedly incurred by plaintiff as a result of their failure to perform, while Count IV alleges that plaintiff became the equitable owner of the Briegel stock by virtue of the contract and prays that All-Steel be required to give an accounting or, in the alternative, that the sale to All-Steel be declared a nullity. In entering summary judgment, the trial court necessarily found that an enforceable contract had not come into being, and our first inquiry must be as to whether there existed a genuine issue of fact with respect to such question.

Pertinent background shows that the Briegel offer, or option, of November 9, 1964, provided in part:

> "This letter is given as assurance to you that if on or before December 1, 1964, you are able to obtain from one Stephen Tonchen a full release of all his claims and demands against the B. M. Fitting Corporation (herein called BMFC), its officers, directors and stockholders, *Briegel Method Tool Company* (a partnership) *and the latter's partners*, in form satisfactory to our counsel (it being understood, however, that you may take an assignment from Mr. Tonchen of his *existing note and mortgages* against BMFC), that the undersigned parties will sell to you all of their capital stock in BMFC on the following terms and conditions:
>
> "...
>
> "4. It is agreed and understood that you will notify either the undersigned parties or their attor-

161

neys (in either Wyoming or Moline, Illinois) in writing of any settlement on or before December 3, 1964. Failure to effect such notice and deliver attendant settlement papers on or before that date shall release the undersigned from any obligation incident to the fulfillment of this obligation." (Emphasis added.)

In response to the foregoing conditions, plaintiff, through its president Dyke, entered into an agreement with Tonchen which, among other things, provided: (1) That Tonchen, upon being notified that the Briegels had placed 75% of their stock in the hands of an escrow agent and upon being paid $100,000, would assign his real and chattel mortgages to plaintiff; and (2) that Tonchen would deliver to the escrow agent a release of all his claims against BMFC, its officers, directors and stockholders. Other provisions validated the disputed claims that Tonchen was making for salary and royalties and stated that they would be paid out of the profits of BMFC after its purchase by plaintiff. And although the agreement was dated December 1, 1964, it is patent from the record that it was not finalized and executed until December 2, 1964, one day after the date fixed in the offer. Benson did not receive a copy of the agreement until December 14, 1964, and it appears that the release and assignment referred to in the agreement were not drafted until the latter part of the month and were never executed.

■■ We are of the opinion the trial court correctly found that plaintiff had not complied with the terms of the offer, and, on the basis of the admitted facts before it, properly entered summary judgment for the defendants on these counts. While it would appear to be questionable as to whether an agreement to give an assignment and release in the future met the terms of the offer, we are not limited to such a narrow ground in arriving at our decision. By the terms of the offer a complete and satisfactory disposition of Tonchen's claims was made to be of

primary importance and, construing the offer in the light most favorable to plaintiff, the latter either had to obtain a "full release" running to both the corporation and the partnership, as well as the individuals connected with each, or to procure an assignment of Tonchen's "note and mortgages." The agreement with Tonchen failed to accomplish either alternative. It provided only for a release of the corporation and its officers, directors and stockholders, and failed to provide for the release of the partnership, a separate legal and business entity, and the individual partners, as the offer required. Similarly, although the offer necessitated the assignment of both the note and the mortgages securing it, the agreement provided only for an assignment of the mortgages, as did the later draft of the assignment that was never executed. Our courts have long held that a mortgage is deemed a mere incident to the mortgage debt, and that an attempt to assign the mortgage without any transfer of the debt will not pass the mortgagee's interest to the assignee, but is a nullity. (Delano v. Bennett, 90 Ill 533, 536; Elvin v. Wuchetich, 326 Ill 285, 288, 157 NE 243; Reeve, Illinois Law of Mortgages and Foreclosures, Vol 1, § 256, p 308.) As to these aspects, therefore, where the express language of the offer and the agreement control, there was no disputed issue of material fact and summary judgment was proper.

Count III of the complaint alleged that plaintiff had secured a commitment from Country Life Insurance to finance BMFC with a loan of $200,000, and prayed for the sum of $10,000 in payment for plaintiff's services in connection therewith. As to this count, we need look no further than the deposition of Dyke to conclude that summary judgment for the defendant was proper. Dyke testified that no fees are due in such transactions until a commitment is made and, completely refuting the allegations of the complaint, admitted that he had not obtained a loan commitment from the insurance company. In the

163

face of such admissions there were, and could be, no genuine factual issues which would require a trial.

The final count of the complaint, Count V, charges that the Briegels and All-Steel "conspired" to "defraud" the plaintiff, that the assets of BMFC were "fraudulently" sold to All-Steel pursuant to such conspiracy, and that plaintiff suffered damages thereby in the amount of $100,000. It has been consistently held in Illinois that the gist of a civil action based upon a conspiracy is not the conspiracy or combination in itself, but rather the overt acts committed in pursuance of the conspiracy. (John Deere Co. v. Metzler Bros., 51 Ill App2d 340, 201 NE2d 478; Ammons v. Jet Credit Sales, Inc., 34 Ill App2d 456, 181 NE2d 601.) In other words, in order to render a conspiracy actionable, the conspiracy must be followed by a wrongful overt act in furtherance thereof. (Kovar v. Bremer, 294 Ill App 225, 13 NE2d 656.) And while, as appellant says, the conspiracy and combination itself must, in most cases, be established by circumstantial evidence and legitimate inferences arising therefrom (e. g. Majewski v. Gallina, 17 Ill2d 92, 99–100, 160 NE2d 783), it is nonetheless incumbent upon a plaintiff to allege and prove wrongful overt acts (or acts which, because of the object of the conspiracy may be deemed wrongful), in furtherance of a conspiracy before a cause of action will lie. As stated in 11 ILP, Conspiracy, § 32, p 110: "The wrongful acts done in pursuance of the objects of the conspiracy, which constitute the gravamen of the action, should be set forth with particularity, . . . ." Count V of the complaint is manifestly inadequate in this regard. It merely alleges in a conclusionary fashion that defendants "did conspire and agree to defraud the plaintiff and sell the assets of BM Fitting Company without the plaintiff's knowledge and consent," and that "pursuant to said conspiracy . . . a fraudulent sale was effected." Under the circumstances, it must be held that no wrongful overt acts, or overt acts which could be

164

deemed wrongful, have been pleaded which could possibly lead to an inference of conspiracy on the part of defendants. (Cf. Bertash Market Co. v. Brown, 70 Ill App2d 8, 217 NE2d 362; Lytton v. Cole, 54 Ill App2d 161, 203 NE2d 590.)

■■ Nor does it appear on this record that any such facts could have been alleged and proved. Clearly there could have been no conspiracy to induce a breach of contract, as plaintiff argues, for the contract never came into existence due to plaintiff's failure to comply with the terms of the offer. And just as clearly, the admitted facts and circumstances do not permit an inference that the Briegels and All-Steel conspired to defraud the plaintiff. Indeed, Dyke admitted in his deposition that he did not believe All-Steel was responsible for the Briegels' failure to sell their stock to plaintiff under the offer, or option, of November 9, 1964. Furthermore, there are no facts which permit a conclusion that All-Steel was guilty of concealment, misrepresentation or wrongful inducement, all of which elements are necessary in an action for conspiracy to defraud. (See: Cibis v. Hunt, 48 Ill App2d 487, 199 NE2d 246.) To the contrary, the admitted facts show that All-Steel and the Briegels did not even negotiate with each other so long as plaintiff's option was outstanding. It is true that All-Steel made inquiries as to the status of their own offer and of the deal with plaintiff, but these circumstances alone are insufficient to support an inference of fraud. On the state of the record it was apparent that there was no material issue of fact relative to Count V, and that nothing remained for trial.

The judgment of the circuit court of Henry County was correct and is therefore affirmed.

Judgment affirmed.

ALLOY, P. J. and STOUDER, J., concur.