**CHRYSLER CREDIT CORPORATION,**
a Delaware Corp.

v.

**FIRST NATIONAL BANK AND TRUST COMPANY OF WASHINGTON, a national banking Association Incorporated under the law of the Commonwealth of Penna.**

Appeal of FIRST NATIONAL BANK AND TRUST COMPANY OF WASHINGTON, PENNSYLVANIA.

No. 84–3208.

United States Court of Appeals,
Third Circuit.

Argued Oct. 1, 1984.

Decided Oct. 15, 1984.

Rehearing and Rehearing In Banc
Denied Nov. 16, 1984.

B.A. Karlowitz (argued), William M. Hoffman, Berkman Ruslander Pohl Lieber & Engel, Pittsburgh, Pa., for appellant.

Thomas E. Reilly (argued), Davis, Reilly & Zehner, P.C., Pittsburgh, Pa., for appellee.

Before ALDISERT, Chief Judge, and HUNTER and WEIS, Circuit Judges.

## OPINION OF THE COURT
PER CURIAM.

■ As stated by the district court, this case brought in diversity under Pennsylvania law presents the question whether presentment of a check at the data processing center of a payor bank requires the bank either to give notice of dishonor or to return the check prior to midnight of the next banking day. The district court conceded that the issue was one of first impression under Pennsylvania law and that the decisions from other jurisdictions are sparse. The district court concluded that the Supreme Court of Pennsylvania, if confronted with the question, would hold that when a check is received at the data processing center of the payor bank, where the bookkeeping services for the branch offices are conducted, the bank's failure to send a notice of dishonor or to return the check before midnight of the next banking day renders the bank liable for the amount of the worthless check pursuant to 13 Pa. Cons.Stat.Ann. § 4302. We will affirm the judgment of the district court on the basis of the opinion of District Judge Donald E. Ziegler, as set forth hereinafter.

■ We offer two additional comments. First, we recognize that this is a case of statutory construction and our standard of review is plenary. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir.1981).

■ Second, we address the argument of the appellant that the district court failed to address the second paragraph of comment 5 to § 4–106 of the Uniform Commercial Code. Appellant argues that in not addressing this paragraph "the District Court ignored what is perhaps the single most important comment applicable to the instant case." Brief for appellant at 14. The appellant is referring to the following excerpt from the comment:

> [I]n its relations to customers a branch may function as a separate bank regardless of whether it maintains its own deposit ledgers. Checks may be drawn on a particular branch and notices and stop orders delivered to that branch even though all the bookkeeping is done at the head office or another branch.

U.C.C. § 4–106 comment 5. We do not disagree that this comment raises a relevant consideration. We also note, however, that the same comment provides: "[I]f a particular bank having branches does all of its bookkeeping at its head office, the branches of that bank do not usually function as separate banks either in the payment or collection of items." *Id.*

We are satisfied that the district court considered all of the relevant data. The court concluded:

> In summary, the language of § 4106 is ambiguous and this court must consider the official comments and other authorities to determine the definition of a "branch bank." As rehearsed, the comments recommend that a branch be judged by the functions it performs,

without regard to where those functions are physically performed.

*Chrysler Credit Corp. v. First National Bank & Trust Co. of Washington,* 582 F.Supp. 1436, 1440 (W.D.Pa.1984).

We adopt as our own, the following opinion of Judge Ziegler:

## I.

Plaintiff, Chrysler Credit Corporation, instituted this diversity action to recover the sum of $53,337.75 from First National Bank and Trust of Washington County, Pennsylvania (First National). Plaintiff also seeks money damages for conversion and fraud. Pennsylvania law is controlling.

The evidence established during the bench trial that Chrysler Credit and Al Barry, Inc., executed financing agreements whereby plaintiff agreed to finance the purchase of new and used vehicles for sale by the dealer. Barry granted a security interest in all vehicles financed under the agreements, and also agreed to remit to Chrysler Credit the proceeds from the sale of all vehicles on the date of sale.[1]

Plaintiff presented evidence, which is not disputed, that Al Barry drew 10 checks on January 18 and 19, 1979, payable to Chrysler Credit Corporation in the total sum of $53,337.75.[2] The checks were drawn on the Barry account at the Charleroi branch office of First National. Chrysler deposited the checks in its account at the Monroeville branch of Mellon Bank on January 19, 1979. The checks were routed through the Federal Reserve and received at the main branch and data processing center of First National at Washington, Pennsylvania, on January 22, 1979.

The checks were processed by employees at the processing center, placed in a reader-sorter memory machine, and posted in a reject journal because they were drawn on

---

**1.** All requirements of state law and the Uniform Commercial Code were satisfied, such as execution and recording, and the parties do not contend otherwise.

**2.** The dates of the checks and the amounts thereof are as follows:

Count 1: Jan. 18–$5046.08;  Count 2: Jan. 18–$4908.53;
Count 3: Jan. 18–$7351.94;  Count 4: Jan. 18–$4760.78;
Count 5: Jan. 19–$4000.00;  Count 6: Jan. 18–$6768.28;
Count 7: Jan. 18–$6508.29;  Count 8: Jan. 18–$6649.68;
Count 9: Jan. 18–$2628.00;  Count 10: Jan. 18–$4716.17.

uncollected funds. The checks were then withdrawn or pulled by employees of central operations.

On January 23, 1979, at approximately 10:30 a.m., the Charleroi branch received a copy of the posting reject journal by courier from the main branch. The branch manager made a decision to pay the checks the same day. However, on January 24, the branch manager reversed the decision, dishonored the checks and notified the processing center. The central operations department returned the checks to plaintiff.

Chrysler Credit instituted this 11-count civil action contending that the data processing center of First National is an integral part of each branch office and therefore the checks were "presented on and received by" the Charleroi branch within the meaning of the Uniform Commercial Code on January 22, 1979. Thus, according to plaintiff, the bank is liable for the amount of each check because it failed to dishonor within 24 hours of presentment. Plaintiff also argues that First National engaged in conversion and fraud when it paid checks drawn on the account of Al Barry in January, 1979 because it knew or should have known that the dealer was engaged in a check kiting scheme.

■ We find that plaintiff has established by a preponderance of the evidence that First National failed to timely dishonor the checks at issue and therefore judgment will be entered for Chrysler Credit at counts one through ten, with interest at 6 percent from January 23, 1979. We further find that plaintiff has failed to establish the tort of conversion by a preponderance of the evidence. Finally, we find that plaintiff has failed to establish fraud by clear and convincing evidence as required by state law, *Snell v. State Examining Bd.*, 490 Pa. 277, 416 A.2d 468, 470 (1980), and therefore judgment will be entered for First National at count eleven.

## II.

The Uniform Commercial Code has been adopted in Pennsylvania and Section 4302 provides that a payor bank must pay, return or dishonor a check within the midnight deadline following presentment to or receipt by the bank. 13 Pa.C.S.A. § 4302(1). The Code defines midnight deadline as "midnight on its next banking day following the banking day on which it receives the relevant item." 13 Pa.C.S.A. § 4104(a). These limitations require that payor banks make decisions on demand items to insure prompt payment to a chain of individuals and institutions in a fluid commercial transaction. Otherwise, a situation is created where a series of banks are extending credit to each other. Leary, *Check Handling Under Article Four of the Uniform Commercial Code,* 49 Marq. L.Rev. 330 (1965). And as one commentator has noted:

> If payor banks delay too long the rights of others may be compromised. Often the depositor may be a seller whose rights will be impaired if he must wait too long to discover if the check has been paid.

Note, *Liability of Payor Banks for Checks Retained Beyond the Midnight Deadline,* The U.C.C. As It Affects Bank Transactions (1978).

The foregoing policy determinations make clear that First National was required to pay, return or dishonor the 10 checks before midnight on the day following presentment. Failure to act renders the bank accountable. 13 Pa.C.S.A. § 4302. First National contends that the checks were "presented on and received by" the payor bank when the Charleroi branch received the posting reject journal on the morning of January 23, because the branch is treated as a separate bank for the purpose of computing the time within which action must be taken under the Commercial Code. *See* 13 Pa.C.S.A. § 4106. Thus, according to defendant, the bank had until midnight on January 24 to meet its deadline. We disagree.

First, the weight of authority is to the contrary. *South Sound Natl. Bank v. First Interstate Bank*, 65 Or.App. 553, 672 P.2d 1194 (1983); *Central Bank of Ala-*

*bama v. Peoples Nat. Bank of Huntsville,* 401 So.2d 14 (Ala.1981); *Capital City First Nat. Bank v. Lewis State Bank,* 341 So.2d 1025 (Fla.Ct.App.1977); *Farmers and Merchants Bank v. Bank of America N.T. & S.A.,* 20 Cal.App.3d 939, 98 Cal.Rptr. 381 (1971). The only contrary authority is *Idah-Best, Inc. v. First Sec. Bank,* 99 Idaho 517, 584 P.2d 1242 (1978), but we find that case distinguishable because (a) the operations of the processing center were limited; (b) the checks were physically delivered to the branch before any action was taken; and (c) state law required that presentment be made at the location designated on the face of the check.

Second, the commentators also subscribe to the view that presentment at a processing center operated by a bank, rather than the banking office where the check is drawn, is effective to trigger the time limits of the midnight deadline. Brady, for example, concludes that the Code "clear[ed] up any doubt that presentment at a processing center is good presentment, so long as it is of an item handled by banks in the collection process ...." H.J. Barkley, *Brady on Bank Checks,* § 13.10 (5th Ed.1979). Finding no reason for a contrary rule so long as the bank has the equipment to process the check, the author concludes that presentment at the processing center complies with the Code provision that "presentment may be made ... to any person who has authority to make or refuse the acceptance or payment." *Id.* at § 13.-10, pp. 13–17 through 13–19; 13 Pa.C.S.A. § 3504(c)(2). Clark and Leary are in accord. Clark, *The Law of Bank Deposits,* § 3.4 (Rev.Ed.1981); Leary, *Deferred and Delayed Returns—The Current Check Collection Problem,* 62 Harv.L.Rev. 905 (1949).

Third, the official comments to the Commercial Code support our conclusion. Comments 4 and 5 to § 4–106 provide:

4. Assuming that it is not desireable [sic] to make each branch a separate branch for all purposes, this Section provides that a branch or separate office is a separate bank for certain purposes.

5. Whether a branch functions as a separate bank may vary depending upon the type of activity taking place and upon practices in the different states. If the activity is that of a payor bank paying items, a branch will usually function as a separate bank if it maintains its own deposit ledgers. Similarly whether a branch functions as a separate bank in the collection of items usually depends also on whether it maintains its own deposit ledgers. Conversely, if a particular bank having branches does all of its bookkeeping at its head office, the branches of that bank do not usually function as separate banks either in the payment or collection of items.

12A P.S. § 4–106 (Comments 4 and 5), *as amended by* 13 Pa.C.S.A. § 4106 (1980).

Given these comments, we conclude that the drafters would consider a computer center as part of a branch bank where: (1) the computer center is the designated place of presentment for checks drawn on the branch's accounts; (2) the computer center performs services specifically for that branch; (3) these services are not customarily performed by the branch itself; (4) these services are an integral part of the branch's processing of checks, and (5) the checks are never physically delivered to the branch but only computerized information is forwarded to the branch.

The legislative history is not to the contrary. The Pennsylvania House and Senate Legislative Journals do not indicate any floor debates or committee reports concerning former § 4–106, now reported as § 4106. That section was amended in 1963 to delete the following bracketed words: "A branch or separate office of a bank [maintaining its own deposit ledgers] is a separate bank...." The Code drafters gave the states the option of retaining or eliminating the bracketed language, and Anderson states in a note to § 4–106 that: "In some states, 'maintaining its own deposit ledgers' is a satisfactory test. In

others, branch banking practices are such that this test would not be suitable." *See* Anderson, *Uniform Commercial Code,* § 4–106 (1971).

Thirty-seven states, including Pennsylvania, deleted the language. In one state, Idaho, the highest court interpreted the deletion as evidence of legislative intent to grant separate bank status to a branch in all cases. *See Idah-Best, Inc. v. First Security Bank of Idaho,* 99 Idaho 517, 584 P.2d 1242, 1248 (1978). However, as we have noted the branch practices there differ from the practice at First National, and we find nothing in the legislative history to indicate that the General Assembly of Pennsylvania intended to grant separate bank status to all branch banks in all circumstances.[3]

Our disagreement with the Idaho court is even more fundamental. If the bracketed language had remained in the Pennsylvania version of § 4–106, Chrysler Credit would be entitled to summary judgment because the Charleroi branch does not maintain its own deposit ledgers. On the other hand, the legislative amendment does not mean that First National must prevail in our view. The deletion only means that Pennsylvania does not require the maintenance of deposit ledgers as the ultimate test for determining whether a branch is a separate bank. A court must look to the functions performed by the branch with respect to the transaction in question. Comment 5 to § 4–106.

In summary, the language of § 4106 is ambiguous and this court must consider the official comments and other authorities to determine the definition of a "branch bank." As rehearsed the comments recommend that a branch be judged by the functions it performs, without regard to where those functions are physically performed.

## III.

Chrysler Credit established by a preponderance of the evidence that the central operations department of First National is located in Washington, Pennsylvania, and is composed of five divisions, namely, central control, bookkeeping, systems and procedures, proof department and data entry. Checks are received by the central control division each day at approximately 8 a.m., placed in numerical order by a computerized process and delivered to the bookkeeping department. Certain checks are not posted automatically to the customer's account because they are rejected by the computer due to some problem, such as uncollected funds, insufficient funds or inactive accounts. These checks appear on a printout known as the posting reject journal.

Checks appearing on the reject journal are pulled by the bookkeeping department, and a copy of the posting reject journal is delivered by courier to the branch at approximately 10 a.m. the next day. The branch manager, according to the preponderance of the evidence, determines whether to pay or dishonor the check by 3 p.m. on the same day. His decision is then conveyed to the reconciling clerk at central operations.

If the branch directs that the check is to be posted to the customer's account, the check is processed in the normal course. If the check is to be returned, the reconciling clerk at central operations stamps the check, indicating the reason, prepares a return letter, and forwards the checks to the Federal Reserve by courier. All checks are delivered that evening.

The parties do not dispute that the 10 checks were received and processed by central operations on January 22, 1979. The evidence also established that the checks appeared on the posting reject journal which was delivered to the Charleroi branch office of First National Bank at

---

**3.** The only evidence of legislative intent behind Pennsylvania's decision to delete the language lies in the title to the Act. "An Act ... promoting uniformity of state law regulating cer- tain commercial transactions ... making the Act conform to the most recent Official Text of the Uniform Commercial Code." Act No. 510, P.L. 1213, Aug. 24, 1963.

10:30 a.m. on January 23, 1979. The Al Barry, Inc. account statement reveals that these checks were debited to the account on January 23, indicating that the branch office determined to honor the checks, and we so find by a preponderance of the evidence. The evidence further established that the branch office reversed its decision and dishonored the checks on the following day. The checks then appeared as a credit on Al Barry's account on January 24.

These facts are not disputed; the parties disagree only as to when the midnight deadline of § 4302 began to run. Because we interpret the intent of § 4302 to favor the expeditious processing of commercial paper and because we find that the banking industry as a whole will benefit if all banks are held to a standard of prompt processing of checks, we hold that the midnight deadline of § 4302 is to be measured from the time checks are presented to a payor bank's computer processing center, where the center is a designated place of presentment and where the center performs an integral and necessary check processing function.

As the instant case demonstrates, our holding does not place an impractical check processing standard upon a bank. The record discloses that the branch offices of First National routinely received the posting reject journal in mid-morning and the branch managers were expected to decide by mid-afternoon on that day whether to dishonor those checks appearing on the journal. Moreover, as the evidence established, First National's branch offices today have computer terminals tied to the computer center at the main office. Branches now can receive the posting reject journal by 8:30 a.m. and branch managers honor or dishonor the checks by 1 p.m.

### IV.

First National asserts that, even if the midnight deadline is measured from the time the checks were presented to the computer center, Chrysler Credit is estopped from recovering in this case. According to First National, when Chrysler Credit deposited the checks in its account at Mellon Bank, it knew and was partly responsible for the unsound financial condition of the dealer's account. Defendant relies upon the following facts to support its affirmative defense.

Chrysler Credit purchased the floorplan of Al Barry, Inc., and held a security interest in every automobile in the floorplan. When a customer purchased a car, the dealer was required to send to Chrysler Credit a copy of the sales contract and a check in the amount of the cost of the vehicle. To ease the cash flow problem of the dealer, Chrysler Credit permitted the dealer to complete a retail finance draft drawn on Chrysler Credit in an amount equal to the amount financed on the car sale. The dealer then presented the draft to First National for deposit. Upon presentment, First National contacted Chrysler Credit, which approved the draft for payment if the sales contract was in proper form.

In asserting estoppel, First National alleges that Chrysler Credit allowed the bank to treat these drafts as cash; permitted Al Barry, Inc., to write these drafts when Chrysler knew or should have known that the dealership was in financial trouble; refused to honor the drafts in mid-January; and Chrysler Credit knew or should have known, when it deposited the 10 checks in its Mellon account on January 19, that there were insufficient funds to cover the checks because plaintiff had refused to honor certain retail finance drafts. We find that First National has failed to prove its affirmative defense.

The essential elements of estoppel are an inducement to a party to believe that certain facts exist, and an act in reliance on that belief. *Sabino v. Junio*, 441 Pa. 222, 272 A.2d 508 (1971). It is well-established under Pennsylvania law that the burden rests on the party asserting estoppel to establish the defense by clear, precise and unequivocal evidence. *Blofsen v. Cutaiar*, 460 Pa. 411, 333 A.2d 841 (1975). In the instant case, we find that defendant has failed to satisfy either the clear evidence test or the lesser standard of proof

by a preponderance of the evidence. There is no evidence that First National's failure to dishonor the checks by the midnight deadline was based upon reliance on any representation or action by Chrysler Credit. The record is devoid of evidence that the bank would have acted any differently if Chrysler Credit had not established the practice of paying the retail finance drafts. Indeed, as the evidence established, Chrysler Credit refused some of the drafts in December, 1978, and stopped honoring them altogether in mid-January, 1979. The evidence is clear that the bank knew that the drafts were to be treated as cash only upon approval by Chrysler Credit. Further, any alleged reliance by First National is undermined by the language appearing on the face of the drafts declaring that the drafts were contingent upon plaintiff's approval.

Not only is the evidence of estoppel in this case not clear, precise and unequivocal, it fails to preponderate. First National failed to establish by any standard that Chrysler Credit knew or should have known that the Al Barry account had insufficient funds when it deposited the 10 checks in its Mellon account. Chrysler Credit's branch manager testified and we find that routine inspection of the Al Barry records demonstrated that the dealership appeared to be in excellent shape. No problems were discovered during the monthly audit of the dealership's inventory or profit and loss statements. Although plaintiff had the authority to review the dealer's bank statements, the evidence established that the statements are not reviewed unless some problem is suspected.

Because we find that First National has failed to meet the burden of proving its defense, we need not address plaintiff's argument that § 4302 of the Uniform Commercial Code imposes strict liability upon a

bank that does not meet its midnight deadline. *See, Central Bank and Trust Co. v. First Northwest Bank*, 332 F.Supp. 1166, *aff'd*, 458 F.2d 511 (8th Cir.1972) (§ 4–302 imposes strict liability upon payor bank).[4]

### V.

Finally, judgment will be entered for First National at count 11 because plaintiff has failed to prove fraud or conspiracy to defraud by clear proof. Chrysler alleges that First National engaged in fraud by permitting the dealer to perpetuate a check kiting scheme. If the bank had stopped the scheme, plaintiff argues, checks would have been returned to Chrysler Credit due to insufficient funds in the Al Barry, Inc., account and Chrysler Credit would have discovered the financial problems at the dealership at an earlier time, thereby preventing further losses. In short, plaintiff seeks to hold First National liable for nondisclosure of a customer's poor financial condition.

■ Pennsylvania law does not impose an affirmative duty on a bank to disclose to the world a customer's financial condition. Section 551 of the Restatement of Torts, Second, accords liability for nondisclosure only if the parties are engaged in a business transaction or stand in a fiduciary relationship. *Matter of Real Estate License v. Commonwealth*, 47 Pa.Commw. 236, 407 A.2d 922 (1979). Here, First National and Chrysler Credit were not involved in a business transaction, nor a fiduciary relationship. The bank's nondisclosure to Chrysler Credit did not constitute fraud because Chrysler Credit was not a party to whom the bank owed a duty of disclosure under Pennsylvania law.

■ Even if we assume such a duty, we find that Chrysler Credit has failed to meet its burden of proof by clear and con-

---

4. Code Section 4–108 (13 Pa.C.S.A. § 4108) excuses a bank's failure to meet the deadline of § 4302 if the delay is caused by "interruption of communication facilities, suspension of payments by another bank, war, emergency conditions or other circumstances beyond the control of the bank provided it exercises such diligence

as the circumstances require." *See also Port City State Bank v. American National Bank,* 486 F.2d 196 (10th Cir.1973) (Bank's failure to meet midnight deadline was excused because computer failure created an emergency condition). None of these defenses are applicable here.

vincing evidence. In Pennsylvania, a party who relies on fraud bears the burden of proving the claim by clear and convincing evidence. *Snell v. State Examining Bd., supra; O'Callaghan v. Weitzman*, 291 Pa. Super. 471, 436 A.2d 212 (1981). The test has not been met because Chrysler Credit failed to prove with sufficient clarity that the bank, in permitting the dealer to deposit checks to cover checks already written, acted with the requisite intent to induce Chrysler Credit to take action to its detriment. There is also no evidence that First National had knowledge of any check kiting scheme. The evidence established that the bank intended to serve a customer—not to defraud plaintiff.

### VI.

In summary, we find that First National is accountable for the face value of the 10 checks in question, plus 6 percent interest calculated from January 23, 1979, when the bank failed to meet its statutory midnight deadline. In so holding, we are mindful of the potential ramifications to the future of statewide banking in Pennsylvania. We emphasize that a bank with operations throughout the Commonwealth may overcome any logistical problems arising from this holding by establishing more than one computer check processing center. For example, in *North Carolina National Bank v. Harwell*, 38 N.C.App. 190, 247 S.E.2d 720 (1978), the defendant bank divided the state into eastern and western operation districts. Each district maintained its own computer processing center. The case arose when a check was presented in the eastern district for deposit in an account in the western district. The court held that the midnight deadline clock began to run when the computer center in the western district received the check.

Our decision is also beneficial to the banking industry whose business transcends county and regional lines by the uniformity in the interpretation of § 4302. As noted by the court in *Farmers Nat. Bank of Beaver Falls v. Peoples Nat. Bank*, 66 P.L.J. 193, 195–196 (1918):

> In a subject of such constant recurrence as the remitting of bills and notes from one part of the country to the other, for collection, it is of the greatest importance that the duties of the respective parties should be clearly understood and at the same time, so far as practicable, that there should be a uniformity of practice.

Judgment will be entered for Chrysler Credit and against First National Bank and Trust Company at counts 1–10. Judgment will be entered, however, for First National at count 11 because there is no evidence of conversion since the bank properly exercised its right of set-off under state law, and because plaintiff has failed to prove fraud by clear and convincing evidence.

The foregoing opinion shall constitute findings of fact and conclusions of law as required by Federal Rule 52. An appropriate judgment order will be filed with [sic] clerk.

The judgment of the district court will be affirmed.