LAMBERT ABELL *et al.*, Plaintiffs-Appellants, v. FIRST NATIONAL BANK IN SHAWNEETOWN *et al.*, Defendants-Appellees.

Fifth District No. 5—85—0374

Opinion filed March 31, 1987.

James Walker, Ltd., of Bloomington, for appellants.

Brown, Hay & Stephens, of Springfield (Harvey B. Stephens, Robert H. Rath, and William F. Trapp, of counsel), for appellee Bank of Harrisburg.

James H. Smith and Joseph R. Hale, both of Shawneetown, and David G. Lynch, of Rudnick & Wolfe, of Chicago, for appellee First National Bank in Shawneetown.

JUSTICE KASSERMAN delivered the opinion of the court:

On June 5, 1981, over 100 individual and partnership plaintiffs filed a complaint in the circuit court of Gallatin County, alleging a conspiracy to defraud on the part of the defendants, First National Bank in Shawneetown (Shawneetown) and Bank of Harrisburg (Harrisburg). It was alleged that defendants, together with Bobby Gene Williams (Williams), conspired to defraud plaintiffs. Williams, who was the owner and operator of a grain business in Junction, Illinois, known as Bob Williams Grain Company, was not made a party defendant, however. Each plaintiff's cause of action was alleged in a separate count. Practically all of the plaintiffs alleged separate but virtually identical counts against each bank; however, a few plaintiffs sued only one or the other of the banks. Each count requested compensatory and punitive damages in excess of $15,000. Twenty-one plaintiffs ultimately were dismissed from the suit for failure to comply with discovery as required by Supreme Court Rule 219(c)(v) (103 Ill. 2d R. 219(c)(v)) or on their own motion for voluntary dismissal (Ill. Rev. Stat. 1983, ch. 110, par. 2—1009).

The plaintiffs' unverified complaint alleges that prior to April 6,

1978, plaintiffs sold grain to Williams but had not been paid for the grain. The complaint alleges that Williams had been insolvent for two years prior to April 6, 1978, that Williams knew he was unable to pay for the grain sold to him by plaintiffs during that time, and that Williams intended to defraud plaintiffs. The complaint also alleges that defendants knew of Williams' insolvency for one year prior to April 6, 1978, that Williams was involved in a "check-kiting scheme" at both banks and that both banks knew of the check-kiting scheme. The complaint further alleged that both banks, in agreement with Williams, intended to defraud plaintiffs by: (1) agreeing in August 1977 to allow Williams to continue the check-kiting scheme; (2) failing to report the check-kiting scheme to the appropriate banking authorities in breach of a statutory duty to do so; (3) paying checks on the Bob Williams Grain Company account on occasions in spite of the fact that the account was overdrawn; and (4) loaning money to Williams to continue his fraudulent scheme despite knowledge that Williams was not creditworthy. In addition, the counts against Shawneetown alleged that Shawneetown agreed to allow Williams to use the Shawneetown account in the check-kiting scheme only if Williams did not pay any farmers from that account. Finally, the complaint alleged that Williams was adjudged a bankrupt on April 6, 1978, and that defendants' wrongful conduct was a proximate cause of the plaintiffs' losses.

Defendants' motion to dismiss the complaint was denied; however, on defendants' motions, the circuit court granted summary judgment in favor of both defendants on May 23, 1985. The remaining plaintiffs have perfected the instant appeal.

■ In order to establish a cause of action for conspiracy to defraud, a plaintiff must allege and prove: (1) a conspiracy; (2) an overt act in furtherance of the conspiracy, in the case at bar a fraud; and (3) damages to the plaintiff as a result of such fraud. See *Commercial Products Corp. v. Briegel* (1968), 101 Ill. App. 2d 156, 164, 242 N.E.2d 317, 321-22; *Cibis v. Hunt* (1964), 48 Ill. App. 2d 487, 494, 199 N.E.2d 246, 249.

■ ■ "A conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means." (*Celano v. Frederick* (1964), 54 Ill. App. 2d 393, 400 n.3, 203 N.E.2d 774, 779 n.3.) The gist of a conspiracy is the overt act committed in furtherance of the conspiracy (*Commercial Products Corp. v. Briegel* (1968), 101 Ill. App. 2d 156, 164, 242 N.E.2d 317, 321), in the case at bar, a conspiratorial act committed with the intent to defraud.

■ ■ While there is no general rule for determining what facts

will constitute fraud, the concept of fraud includes wrongful intent, *i.e.*, conduct "calculated to deceive." (See *Majewski v. Gallina* (1959), 17 Ill. 2d 92, 99, 160 N.E.2d 783, 788.) Generally, evidence of concealment, misrepresentation, and wrongful inducement are necessary to prove a conspiracy to defraud. (*Commercial Products Corp. v. Briegel* (1968), 101 Ill. App. 2d 156, 165, 242 N.E.2d 317, 322.) Because a conspiracy is difficult to prove with direct evidence, it may be established by circumstantial evidence and legitimate inferences therefrom. (*Majewski v. Gallina* (1959), 17 Ill. 2d 92, 99, 160 N.E.2d 783, 788.) However, proof of civil conspiracy must be clear and convincing if made solely by circumstantial evidence. *Tribune Co. v. Thompson* (1930), 342 Ill. 503, 529, 174 N.E. 561, 571.

■ A motion for summary judgment should be granted when the pleadings, depositions, admissions, and affidavits establish that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).) Despite almost four years of discovery and a voluminous record, we conclude, as did the circuit court, that plaintiffs have not presented sufficient evidence on the issue of defendants' intent to defraud or the question of proximate cause to withstand defendants' motions for summary judgment.

The relevant and material facts are as follows: There is no dispute that Williams had been engaged in the grain business since 1969 and that he maintained accounts at both defendant banks during this period. Williams used "price later" contracts in his business transactions with some of the grain producers. These contracts allowed Williams to purchase grain from the farmers on credit during harvest season and immediately sell it for cash. The farmers were allowed to price their grain later during the off-season, if they chose, when the market was not glutted, with the prospect that they might receive a better price. Williams and the banks all realized that Williams' cash flow fluctuated accordingly.

The documentary evidence reveals the following about Williams' banking activity at the two banks:

(A) as to Harrisburg:

### Bank of Harrisburg (in thousands)

| Date | Savings Acct. Balance (CDs) | Checking Acct. Balance | Monthly Deposits | Deposits from Shawnee-town | Monthly Checks | Checks to Shawnee-town |
|---|---|---|---|---|---|---|
| 10-01-76 | -0- | 193 | 4000 | 600 | 4000 | 177 |

 

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 11-01-76 | 2300 | 22 | 3480 | 900 | 3500 | 435 |
| 12-01-76 | 4300 | 24 | 2760 | 605 | 2800 | 210 |
| 01-01-77 | 4100 | (2) | 6700 | 1680 | 6700 | 1750 |
| 02-01-77 | 2200 | -0- | 4250 | 1360 | 4180 | 1485 |
| 03-01-77 | 500 | 73 | 2100 | 250 | 2200 | -0- |
| 04-01-77 | 1400 | 27 | 4140 | 1250 | 3900 | 1160 |
| 05-01-77 | 1000 | 207 | 2830 | 1015 | 3000 | 1245 |
| 06-01-77 | 750 | 10 | 2970 | 1550 | 2700 | 1535 |
| 07-01-77 | 250 | 276 | 3360 | 1970 | 3630 | 2075 |
| 08-01-77 | 250 | 4 | 2100 | 1500 | 2010 | 876 |
| 09-01-77 | -0- | 92 | 2840 | 1100 | 2900 | 1400 |
| 10-01-77 | 450 | 5 | 1880 | 82 | 1880 | N/A |
| 11-01-77 | 1050 | -0- | 2490 | 400 | 2450 | N/A |
| 12-01-77 | 245 | 35 | 1820 | N/A | 1810 | 1800 |
| 01-01-78 | 1850 | 44 | 2160 | 461 | 2230 | 1770 |
| 02-01-78 | 150 | 1 | 1700 | 1130 | 1700 | 181 |
| 03-01-78 | 250 | 5 | -- | -- | -- | -- |

Furthermore, Williams maintained a secured loan with Harrisburg, originated on January 5, 1977, in the amount of $277,000. The principal balance of this loan was paid down on occasion and more funds were lent to bring the balance back to $277,000. For example, on February 24, 1977, the balance was paid down to $2,000; on July 28, 1977, new funds were lent returning the loan to the original balance; on October 12, 1977, the balance was paid down to $1,000; on December 10, 1977, an additional $200,000 was lent; on January 7, 1978, the $200,000 was repaid; and on February 14, 1978, an additional $276,000 was lent. The amount of $277,000 was Harrisburg's legal lending limit to any one customer.

(B) as to Shawneetown:

### Bank of Shawneetown (in thousands)

| Date | Savings Acct. Balance (CDs) | Checking Acct. Balance | Monthly Deposits | Deposits from Harrisburg | Monthly Checks | Checks to Harrisburg |
|---|---|---|---|---|---|---|
| 10-01-76 | -0- | 3 | 791 | 377 | 700 | 300 |
| 11-01-76 | 400 | 94 | 874 | 235 | 900 | 600 |
| 12-01-76 | 400 | 68 | 1000 | 210 | 1100 | 905 |
| 01-01-77 | 200 | 7 | 2870 | 2250 | 2450 | 750 |
| 02-01-77 | -0- | 433 | 2000 | 985 | 2300 | 2235 |
| 03-01-77 | 30 | 155 | 701 | 325 | 851 | 150 |
| 04-01-77 | 30 | 4 | 1000 | 835 | 920 | 920 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 05-01-77 | 30 | 86 | 1620 | 1475 | 1450 | 1300 |
| 06-01-77 | 30 | 268 | 1535 | 1535 | 1800 | 1550 |
| 07-01-77 | 30 | 2 | 2530 | 2417 | 2430 | 1930 |
| 08-01-77 | 30 | 99 | 1734 | 1140 | 1550 | 1550 |
| 09-01-77 | 30 | 282 | 1300 | 1200 | 1600 | 1100 |
| 10-01-77 | 30 | 8 | 842 | N/A | 818 | 30 |
| 11-01-77 | 730 | 31 | 1700 | N/A | 1670 | 461 |
| 12-01-77 | 1030 | 63 | 2340 | 1800 | 2370 | N/A |
| 01-01-78 | 1030 | 24 | 3900 | 1770 | 3900 | 140 |
| 02-01-78 | 330 | 1 | 3000 | 1730 | 2700 | 1000 |
| 03-01-78 | 250 | 287 | -- | -- | -- | -- |

Also, Williams had at least one loan with Shawneetown, made in January or February of 1978, in the amount of $100,000. This loan was secured by a financing statement covering grain and was outstanding at the time of the bankruptcy. There is evidence in the record that Shawneetown's legal lending limit was approximately $150,000 during this period of time. It was also shown that Williams' father was a director of Shawneetown.

This evidence demonstrates that Williams was engaged in a substantial amount of check-kiting during this period of time. Furthermore, it had been the practice of both defendants to call Williams' office to inform him of the amount required to avoid a negative balance at the close of business on that particular day when they received checks to be paid from Williams' checking account in an amount in excess of his balance, including uncollected funds. These "overdrafts" could be as much as $300,000. Williams or one of his employees would then bring a deposit to the bank. These deposits would consist of whatever receipts Williams had collected that day. In addition, a check drawn on the other defendant sometimes would be deposited to retire the balance of the overdraft. In this manner Williams was able to maintain an artificially high balance in each account.

At the end of March 1978, however, both banks refused to honor checks drawn by Williams when his accounts contained insufficient collected funds. Williams was adjudged bankrupt on April 6, 1978. At that time, some plaintiffs were left with dishonored checks, other plaintiffs had never priced their grain pursuant to the price-later contracts, and still other plaintiffs had priced their grain under the contracts in late March 1978 but had not demanded payment. According to plaintiffs' answers to interrogatories, the remaining plaintiffs claim damages in excess of $1,600,000. A majority of that figure represents grain delivered to Williams during the fall harvest season of 1977; however, some plaintiffs claim damages for grain delivered in 1975

and 1976, earlier in 1977, and in early 1978.

Also, according to plaintiffs' answers to interrogatories, almost all plaintiffs filed a proof of claim in Williams' bankruptcy, but none received a distribution. None of the plaintiffs filed an objection to Williams' discharge from bankruptcy.

Harrisburg filed a proof of claim in the bankruptcy, stating that Williams was liable to it in the amount of the secured loan, in addition to the amount of $544,518.38. This amount represented Harrisburg's payment of checks drawn on it payable to other parties, which were paid from uncollected funds resulting from recently deposited checks drawn on Shawneetown. Shawneetown filed a proof of claim in the bankruptcy, stating that Williams was liable to it in the amount of $191,714.34, representing two checks drawn on Shawneetown and deposited in Harrisburg on March 22 and 23, 1978, which were charged to Shawneetown by the Federal Reserve Bank.

Williams admitted check-kiting in his deposition testimony and admitted not keeping accurate checking account records. Williams testified in his bankruptcy proceeding in 1978 that he thought his liabilities exceeded his assets as far back as 1973. Williams also testified in 1980, in a different proceeding, that he "hid" some records at times since 1973 so that he could understate his liabilities.

Plaintiffs contend that defendants knew of Williams' check-kiting and his insolvency long before March 1978. Defendants filed the affidavits of Dean Bittle, who was executive vice-president at Harrisburg from 1973 to 1982, and Patrick Felker, then executive vice-president at Shawneetown, in support of their motions for summary judgment. While the affiants denied the allegations of plaintiffs' complaint and disclaimed knowledge of Williams' check-kiting and insolvency until late March 1978, their affidavits and deposition testimony are not entirely consistent. In addition, employees of both banks testified that before August 1977, they thought Williams was kiting checks and that they told their respective superiors, *i.e.*, Bittle and Felker. Also, Felker testified, in 1981 in a different proceeding, that on March 29, 1978, as the decisions were being made to bounce Williams' checks, Bittle asked Felker: "Is it possible that we continue doing for Williams what has been done up to now for at least a period of time until he gets straightened out [?]" Thus, the evidence in this record establishes that both banks knew of the check-kiting before August 1977. We note that Shawneetown is a Federal bank and that Federal banks are required to make an immediate written report to Federal authorities of known or suspected check-kiting operations. 12 C.F.R. sec. 7.5225 (1985) (eff. Aug. 26, 1971).

With respect to defendants' alleged knowledge of Williams' insolvency, the record indicates that Williams understated his liabilities and that Williams' apparent last financial statement, dated December 31, 1976, showed a net worth of about $200,000. There is, however, no evidence that defendants knew of the extent of the sums due to farmers from Williams.

In addition, as late as January 1, 1978, Williams had time deposits (CDs) at Harrisburg in the amount of $1,850,000 and at Shawneetown in the amount of $1,030,000. Furthermore, all of Williams' checks had been paid until late March 1978.

Plaintiffs also contend that the payment of checks on uncollected funds by the banks was actually a loan. Plaintiffs urge that when these amounts are added to the conventional loans outstanding from time to time between each bank and Williams, each bank exceeded its legal lending limit to any one customer. (See 12 U.S.C. sec. 84(a)(1) (1982); Ill. Rev. Stat. 1977, ch. 16½, sec. 32.) We note that Harrisburg, as part of its general loan policies, considered overdrafts as a form of unsecured lending. Harrisburg's policy was that overdrafts were to be handled and approved only by its executive vice-president, at his discretion commensurate with prudent banking practices, and subject to his lending limit, which was $25,000.

■ Nevertheless, assuming that each bank violated Federal regulations, State law, and its own policies, when all the facts and circumstances are considered, we conclude that plaintiffs have not presented sufficient, clear and convincing evidence to create a genuine issue as to defendants' intent to defraud and defendants' liability to plaintiffs.

The mere knowledge and appreciation of a risk, short of a substantial certainty, is not the equivalent of intent. (W. Prosser, Torts sec. 8, at 32 (4th ed. 1971).) Defendants' handling of Williams' accounts may be considered negligent or even reckless but plaintiffs have not shown sufficient evidence to establish defendants' intent to defraud. It is not necessarily commercially unreasonable for a bank to honor checks drawn on uncollected deposits of an old and established customer. *First National Bank v. Insurance Co. of North America* (1970), 424 F.2d 312, 316.

Furthermore, we conclude, as did the circuit court, that plaintiffs have failed to present sufficient evidence to indicate that defendants' conduct was a proximate cause of their damages.

The crux of plaintiffs' case is that the banks' conduct contributed to Williams' appearance of solvency and contributed to his ability to pay for grain already received so that the plaintiff farmers would be induced to continue to deliver grain to him. Plaintiffs urge that "but

for" the defendants' wrongful conduct, plaintiffs would not have delivered their grain to Williams. See *Adam v. Mt. Pleasant Bank & Trust Co.* (Iowa 1986), 387 N.W.2d 771, 776.

However, the evidence indicates that some of the grain for which plaintiffs seek damages was delivered to Williams in 1975 or 1976. Plaintiffs have offered no evidence that they were induced to do business with Williams at that time because of any conduct or omission on the part of the defendants. While the record indicates that more than half of the plaintiffs were deposed, only excerpts from a few of plaintiffs' depositions were included in the record on appeal. These excerpts and plaintiffs' answers to interrogatories reveal that plaintiffs were unaware of and unconcerned with Williams' banking practices. Plaintiffs' answers to interrogatories indicate that neither defendant made oral or written representations to any plaintiff concerning the financial condition of Williams. In addition, the defendants were not guarantors of Williams in his business transactions; and neither had a fiduciary relationship with plaintiffs or any duty toward plaintiffs regarding Williams' financial conditions. An analogous issue was considered by the court in *Popp v. Dyslin* (1986), 149 Ill. App. 3d 956, 500 N.E.2d 1039, in which the court was faced with the necessity of determining whether a bank was liable to creditors of a borrower to whom the bank allegedly negligently misrepresented the financial qualification of its borrower. The court in *Popp*, concluding that a bank owed no duty to a third-party creditor for negligently investigating the financial condition of a borrower, stated:

> "Unlike the certified public accountant and the surveyor who both certify and guarantee their work knowing that other persons will rely on their expertise, a bank's only obligation flows between the bank and its borrower. A bank does not have the expertise that an accountant or a surveyor has; it does not certify or guarantee its work. A banker deals only with a borrower by gathering the information necessary to help it determine whether the borrower is creditworthy. Any creditor could conduct its own credit investigation. Moreover, any number of creditors may receive the proceeds of a loan. Absent a contractual obligation, a bank has no control over who ultimately receives the proceeds. Furthermore, we cannot hold a bank liable simply because a borrower does not pay one of those creditors." (149 Ill. App. 3d 956, 963, 500 N.E.2d 1039, 1043.)

Based upon the rationale of *Popp*, we conclude that defendants owed no duty to communicate to plaintiffs any information that they may have had concerning Williams' financial condition if they did, in fact,

have such information. See generally Restatement (Second) of Torts secs. 551, 552 (1977). See also *Chrysler Credit Corp. v. First National Bank & Trust Co.* (1984), 746 F.2d 200, 207.

While it may appear that defendants' conduct was a "cause in fact" of plaintiffs' losses (see W. Prosser, Torts sec. 41, at 236-37 (4th ed. 1971)), we nevertheless conclude that plaintiffs have not presented sufficient evidence to show that defendants' conduct was "a material element and a substantial factor" in bringing about plaintiffs' losses. (W. Prosser, Torts sec. 41, at 240 (4th ed. 1971)). We conclude therefore that, as a matter of law, plaintiffs have not met their burden of proving proximate cause beyond mere speculation or conjecture. See W. Prosser, Torts sec. 41, at 241 (4th ed. 1971); *Kimbrough v. Jewel Cos.* (1981), 92 Ill. App. 3d 813, 817, 416 N.E.2d 328, 331.

Plaintiffs rely heavily on the case of *Adam v. Mt. Pleasant Bank & Trust Co.* (Iowa 1986), 387 N.W.2d 771, a group of consolidated cases involving multiple plaintiffs. *Adam* involves facts similar to those in the case at bar. Plaintiffs were grain producers who brought suit against a grain company's bank after the grain company was declared bankrupt. The plaintiffs in Adam, as do plaintiffs here, brought a cause of action for conspiracy to defraud. The evidence in *Adam* indicated that the grain company "acted in concert with the bank to give the grain company a false appearance of financial stability." (387 N.W.2d 771, 773.) The trial court in *Adam* made a specific finding that the bank had acted in concert with the grain company and entered judgment for plaintiffs. This finding was based on substantial evidence that the grain company's manager was one of the bank's directors and that the bank violated banking statutes concerning the limit of a bank's loans to its directors, overdrafts by a director, limits on loans to its officers, and restrictions prohibiting officers and employees from receiving anything of value for procuring a loan (387 N.W.2d 771, 774.) The trial court in *Adam* also found that other acts of the bank were "deviations from sound banking practices," *e.g.*, exchange of possession of collateral and check-kiting. 387 N.W.2d 771, 775-76.

We note several distinguishing facts between *Adam* and the case at bar. In *Adam*, the manager of the grain company was a director of the bank, and there were allegations that the bank officers artificially sustained the life of the grain company in order to prevent a drop in the value of their own bank stock. (387 N.W.2d 771, 773-74.) More importantly, the Iowa Supreme Court, as it was required to do on review, construed the evidence most favorably to the plaintiffs and interpreted the trial court's findings broadly and liberally to uphold

956

rather than defeat the judgment. (387 N.W.2d 771, 773, 776.) In any event, to the extent that our decision is inconsistent with *Adam*, we expressly decline to follow it.

While we are sympathetic to the plight of the plaintiffs in the case at bar, and we do not condone the defendant's conduct, we find the evidence insufficient to withstand defendants' motions for summary judgment. We therefore affirm the circuit court's entry of judgment for defendants.

Affirmed.

KARNS, P.J., and WELCH, J., concur.