STEPHEN YOUNG, Special Adm'r of the Estate of Andrew Young, Indiv. and on Behalf of a Class of Similarly Situated Persons, et al., Plaintiffs-Appellees, v. BRYCO ARMS et al., Defendants-Appellants.—OBRELLA SMITH, Special Adm'r of the Estate of Salada Smith, Deceased, Indiv. and on Behalf of a Class of Similarly Situated Persons, et al., Plaintiffs-Appellees, v. NAVEGAR, INC. d/b/a Intratec Firearms et al., Defendants-Appellees.—ANTHONY CERIALE, Special Adm'r of the Estate of Michael Ceriale, Indiv. and on Behalf of a Class of Similarly Situated Persons, Plaintiffs-Appellees, v. SMITH AND WESSON CORPORATION et al., Defendants-Appellants.

First District (1st Division)   Nos. 1—01—0739, 1—01—0740, 1—01—0742 cons.

Opinion filed December 31, 2001.—Rehearing denied March 18, 2002.

952

Mary Kay Scott and Stephen A. Kolodziej, of Brenner, Ford & Monroe, Ltd., Richard J. Leamy, Jr., of Wiedner & McAuliffe, Ltd., William N. Howard and Daniel J. Voelker, both of Freeborn & Peters, and Wildman, Harrold, Allen & Dixon, all of Chicago (James P. Dorr, Sarah L. Olson and Lisa S. Simmons, of counsel), for appellants.

Thomas H. Geoghegan, of Despres, Schwartz & Geoghegan, Jonathan K. Baum, Bradley S. Rochlen, and Andrew J. Abrams, all of Katten Muchin Zavis, and Locke E. Bowman and Jean MacLean Snyder, all of Chicago, for appellees.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiffs are the surviving relatives of five individuals who were shot and killed in Chicago by juveniles with access to handguns. The defendants are various manufacturers, distributors and dealers of handguns.

Three complaints, filed separately, were consolidated for the purpose of this appeal: (1) Stephen Young filed a complaint on behalf of his son, Andrew Young, who was killed on the streets of Chicago by a juvenile street gang member using a gun manufactured by defendant Bryco Arms (Bryco) (*Young v. Bryco Arms*, No. 98 L 6684); (2) Obrellia Smith filed a complaint on behalf of her daughter, Salada Smith, who was killed in the course of a drive-by shooting by a juvenile gang member using a gun manufactured by defendant Navegar, Inc. (Navegar) (*Smith v. Navegar, Inc.*, No. 98 L 13465); and (3) Anthony Ceriale filed a complaint on behalf of his son, Michael Ceriale, who was killed in the course of his duties as a Chicago police officer by a juvenile gang member using a .357 Magnum revolver manufactured by defendant Smith & Wesson Corporation (Smith & Wesson) (*Ceriale v. Smith & Wesson Corp.*, No. 99 L 05628).

After a ruling issued by the trial court on May 11, 2000, plaintiffs Young and Smith amended their complaints, in part, to include two additional plaintiffs. Young added plaintiff Arlene Macias, suing on behalf of her son Miguel Macias, who was killed in Chicago by a juvenile gang member using a .38-caliber semi-automatic handgun that was never recovered. Smith added plaintiff Rasell Bowman, suing on behalf of her son Willie Lee Lomax III, who was killed in Chicago by a 14-year-old gang member using a .38-caliber revolver that was also never recovered.

The plaintiffs' complaints allege a public nuisance claim against 18 firearm manufacturers, 4 wholesale distributors and 2 suburban

retail gun dealers who, according to the complaints, are all individually responsible for the public nuisance of widely available handguns that are accessible to juveniles in the City of Chicago.

The defendants filed various motions to dismiss plaintiffs' public nuisance claims. On February 14, 2001, the trial court held in favor of the plaintiffs, ruling that the plaintiffs stated a cause of action in public nuisance against the defendants. The trial court then certified the following question pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308) for immediate interlocutory appeal:

> "Does plaintiffs' Fifth Amended Complaint in *Young v. Bryco Arms*, No. 98 L 6684, and plaintiffs' Third Amended Complaint in *Smith v. Navegar, Inc.*, No. 98 L 13465, and plaintiffs' Third Amended Complaint in *Ceriale v. Smith & Wesson Corp.*, No. 99 L 05628, state a viable public nuisance cause of action under Illinois law against the defendants in those respective cases?"

On March 6, 2001, the defendants moved for leave to appeal the trial court's order of February 14, 2001, as certified on February 20, 2001. This motion was granted on March 22, 2001.

## BACKGROUND

### Plaintiffs' Complaints

The complaints assert that the plaintiffs and others possess a public right to use the streets and other public places within the City of Chicago without fear, apprehension and undue risk of injury to themselves or to their families. Plaintiffs allege that defendants' marketing and distribution practices have unreasonably interfered with this public right by virtue of the wide availability of handguns that are accessible to juveniles in Chicago.

Specifically, plaintiffs allege that defendants produce and sell handguns that are designed to appeal to criminally oriented juvenile street gangs and other criminals. For example, defendant Navegar markets the TEC-DC9, a military-style assault weapon that features a silencer, a sling swivel to facilitate spray firing of the weapon and a finish that provides resistence to fingerprints. Defendant Bryco Arms markets the Bryco 59, a semi-automatic handgun that is small, easily concealable and inexpensive. Defendant Smith & Wesson markets the .357 Magnum revolver as a "man stopper," which is capable of firing a longer-than-usual round and propelling a bullet more rapidly so as to do more damage to the intended target.

Plaintiffs also allege that defendants: (1) distributed firearms through a market structure intentionally created by defendants by relying on low-end retailers who encourage purchasers to illegally transport weapons to Chicago; (2) failed to regulate or discipline

known irresponsible dealers; (3) flooded the market in areas surrounding Chicago, knowing and foreseeing that excess firearm supply would be taken to Chicago and possessed and used illegally; and (4) created and maintained an underground market for handguns "knowing and intending this result."

## Chain of Distribution

Plaintiffs allege the following facts regarding the circumstances surrounding the death of plaintiffs' decedents. First, the Young complaint alleges that Andrew Young was shot and killed on June 10, 1996, at the corner of Clark and Howard Streets in Chicago. The complaint asserts that Mario Ramos shot Young at the instigation of Roberto Lazcalo, who was allegedly associated with the Latin Kings. The firearm used by Ramos was a Bryco 59 manufactured by defendant Bryco Arms. It was shipped to defendant distributor Jennings Firearms, Inc., on July 23, 1993. On July 28, 1993, Jennings shipped the weapon to defendant distributor Riley's, Inc. Riley's then shipped the gun to defendant retail seller Breit & Johnson Sporting Goods, Inc., on August 6, 1993, located in Oak Park, Illinois. The complaint further alleges that Bryco was on notice that both Jennings and Riley's were among a core group of 10 irresponsible distributors which acted as distributors for nearly half of the firearms traced to crimes in Chicago. The complaint alleges that Riley's was also on notice that Breit & Johnson was one of a core group of 24 irresponsible gun dealers operating in Chicago.

On September 7, 1993, the gun was sold to Mariano DiVittorio under circumstances which the plaintiffs allege should have alerted Breit & Johnson that this was a "straw purchase" (*i.e.*, purchased not for DiVittorio himself, but for the benefit of Daniel Escobedo, a notorious convicted felon with ties to the Latin Kings street gang). Escobedo then directly or indirectly caused the gun to be transferred to the Latin Kings, making it available to Roberto Lazcalo and Mario Ramos, who used it to kill Andrew Young.

According to the Young complaint, coplaintiff Miguel Macias was shot and killed on June 4, 1997, by Christopher Raygoza, age 19, Leslie Matos, age 18, and Raul Quezada, age 14, at a pizza shop. Although the complaint alleges that Macias was shot with a .38-caliber semiautomatic handgun, the weapon was never recovered.

Second, the Smith complaint alleges that Salada Smith was murdered on June 22, 1997, and that Darnell Foxx was one of three juveniles arrested and charged with her death. The complaint states that the TEC-DC9 used to kill Smith was manufactured and marketed by defendant Navegar. On February 3, 1992, Navegar shipped the gun

to a distributor called RSR Wholesale Guns. RSR then shipped the gun to retailer Perry's Trading Post in Greenwood, Mississippi, on February 17, 1992. Approximately 2¹/₂ weeks before RSR shipped the weapon, the partners who owned Perry's were indicted by the federal government for illegal gun sales. The complaint alleges that RSR and defendant Navegar knew or reasonably should have known that the principals of Perry's Trading Post were engaged in illegal gun sales at the time the weapon was shipped to Perry's.

Perry's then allegedly sold the gun to an unknown purchaser on March 28, 1992. Following that sale, the weapon flowed into an underground market and was owned by the Vice Lords street gang in Chicago. On June 22, 1997, it was used by 15-year-old Darnell Foxx to kill Salada Smith and her unborn child in a gang-related drive-by shooting.

The Smith complaint further alleges that coplaintiff Willie Lee Lomax III was murdered by 14-year-old Christopher Kronenberger, a member of the Two Six street gang. The firearm used to kill Lomax was allegedly a .38-caliber revolver but was never recovered.

Third, the Ceriale complaint alleges that police officer Michael Ceriale was shot on August 15, 1998, while he was conducting a narcotics surveillance in a vacant lot in Chicago. He died on August 21, 1998. Jonathan Tolliver, who was then 16 years old and a member of the Gangster Disciples, was convicted of the murder. Defendant Smith & Wesson marketed the .357 Magnum revolver used by Tolliver and sold it to distributor Camfour, Incorporated, on April 4, 1995. On April 10, 1995, Camfour shipped the revolver to a gun dealer listed in an invoice as Strictly Shooting, located in Merrionette Park, Illinois. The complaint further alleges that Smith & Wesson was on notice that Camfour was among a core group of 55 irresponsible distributors which acted as initial distributors for nearly 80% of the firearms traced to crimes in Chicago. The complaint alleges that Camfour was also on notice that Strictly Shooting was one of 65 irresponsible gun dealers located in close proximity to Chicago.

Strictly Shooting sold the revolver some time later to an unknown purchaser. It then reached the possession of a Chicago resident, Laura Crowell, who sold it to a suburban retail store located in Cook County called Chuck's Gun Shop in September 1997. On December 28, 1997, Chuck's sold the revolver to Ezra Evans in circumstances that the complaint alleges should have alerted Chuck's that this was a straw purchase made for the benefit of the Gangster Disciples street gang. The gun was then used by Tolliver to shoot Ceriale on August 15, 1999.

The complaints allege that each of the five named plaintiffs has

suffered the death of a relative as a consequence and the proximate result of the public nuisance. Count I of all three complaints alleges public nuisance claims for damages against the specific manufacturers of the guns used in the murders. Thus, plaintiff Young claims damages against Bryco, Smith sues Navegar, and Ceriale asserts damages against Smith & Wesson.

Count II involves allegations of public nuisance by plaintiffs Young and Macias, Smith and Bowman, and Ceriale against all of the handgun manufacturers and distributors named in the complaints, including those manufacturers and distributors which did not manufacture, sell or distribute the firearms identified in the killings.

Plaintiffs assert counts III and IV as class actions for public nuisance on behalf of themselves and as representatives of the class of persons whose decedents have been killed or who have themselves been physically injured or threatened with a handgun. Count III claims damages against all of the handgun manufacturers and distributors named in the complaint, while count IV seeks injunctive relief.

Count V asserts negligence against the specific manufacturers of the guns used in the killings and was dismissed by the trial court. Count VI in the Young and Ceriale complaints is also a negligence claim against the gun dealers which sold the guns used in the killings and was dismissed by the trial court. Count VI of the Smith complaint alleges assault and battery.

Finally, count VII of the Young and Ceriale complaints alleges public nuisance against the specific gun dealers which sold the firearms used in the murders (Breit & Johnson and Chuck's Gun Shop, respectively).

## Procedural History

After plaintiffs filed their three complaints, on July 1, 1999, certain manufacturer defendants submitted motions to dismiss plaintiffs' public nuisance claims. On November 30, 1999, the trial court denied defendants' motion to dismiss the public nuisance claims. The plaintiffs then amended their complaints to add the "unrelated defendants"—a term coined by defendants to describe those who did not manufacture, distribute or sell the firearms identified in the shootings. On January 13, 2000, defendants moved to dismiss these complaints pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1998)). On May 11, 2000, the trial court dismissed plaintiffs' negligence claims. Finding no special relationship between the parties that could support the imposition of a duty on the manufacturers to protect plaintiffs from the criminal acts of remote, unrelated third parties, the court concluded:

"Under the current status of Illinois law, the manufacturers and distributors owed no duty to plaintiffs to control the distribution of handguns based upon the allegations in plaintiffs' Complaints."

The trial court further reserved ruling on the sufficiency of the plaintiffs' public nuisance claims against the "unrelated defendants," reasoning that if a class were certified, certain class members may have a claim against these manufacturers.

On July 25, 2000, plaintiffs moved to amend the complaints. Plaintiffs added allegations concerning the specific chain of distribution and ownership of identified firearms, and statistical data, and Young and Smith sought to join plaintiffs Macias and Bowman, respectively. On December 13, 2000, defendants brought multiple section 2—615 and section 2—619 motions, seeking a reconsideration of the trial court's November 30, 1999, ruling. Individual manufacturers also brought separate section 2—619 motions, arguing that they should be dismissed from the actions because there was no claim that their specific products were used in any of the shootings.

On February 14, 2001, the trial court denied the defendants' multiple motions to dismiss the public nuisance claims. The trial court found that plaintiffs stated a viable public nuisance cause of action against the defendants who actually manufactured, distributed or sold the identified firearms. The court rejected defendants' claims that lawful conduct could not constitute nuisance, reasoning that plaintiffs' core allegation was not whether defendants lawfully sold guns, but that defendants' marketing and distribution practices allowed an underground gun market to flourish. The court also found that by releasing weapons into a chain of distribution, the defendants created and controlled conditions that made guns freely available to juveniles.

The trial court further held that plaintiffs stated a cause of action against the "unrelated defendants." Relying on *Cook v. City of Du Quoin*, 256 Ill. App. 452 (1930), the court held that defendants could be held jointly and severally liable where their actions, although separate and distinct in time and conduct, culminated in producing the public nuisance that enabled the underground handgun market to flourish. The court further found the inclusion of the claims of plaintiffs Macias and Bowman to be proper. The court distinguished *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222 (1990), indicating that unlike plaintiffs in *Smith*, Macias and Bowman were not claiming that one particular gun caused their injuries. According to the court, the plaintiffs were instead claiming that defendants caused a saturation of guns in Chicago and these guns, in turn, allegedly caused the death of plaintiffs' decedents.

On February 20, 2001, the trial court certified the question noted

above for interlocutory appeal. The petition for interlocutory appeal was granted by this court on March 22, 2001.

## ANALYSIS

### I. STANDARD OF REVIEW

■ The question certified for interlocutory appeal asks whether the plaintiffs' complaints "state a viable public nuisance cause of action under Illinois law against the defendants." This question of law challenges the legal sufficiency of the complaints and, as such, is appropriately examined under the standard of review applicable to a section 2—615 motion to dismiss. 735 ILCS 5/2—615 (West 1998).

A motion to dismiss a complaint pursuant to section 2—615 attacks the legal sufficiency of the complaint. *Joseph v. Chicago Transit Authority*, 306 Ill. App. 3d 927, 930, 715 N.E.2d 733 (1999). In reviewing the sufficiency of a complaint, the court must accept as true all well-pleaded facts in the complaint and all reasonable inferences that can be drawn from those facts. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86, 672 N.E.2d 1207 (1996). "Pleadings are to be liberally construed, and a pleader is not required to set out his evidence but only the ultimate facts to be proved." *Gilmore v. Stanmar, Inc.*, 261 Ill. App. 3d 651, 654, 633 N.E.2d 985 (1994). The court must determine whether the allegations of the complaint, when considered in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. *Board of Directors of Bloomfield Club Recreation Ass'n v. Hoffman Group, Inc.*, 186 Ill. 2d 419, 424, 712 N.E.2d 330 (1999). A cause of action will not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle the plaintiff to relief. *Van Horne v. Muller*, 294 Ill. 2d 649, 652-53, 705 N.E.2d 898 (1998). The sufficiency of a complaint is an issue of law and is reviewed *de novo. People ex rel. Devine v. $30,700.00 United States Currency*, 316 Ill. App. 3d 464, 474, 736 N.E.2d 137 (2000).

### II. ELEMENTS OF PUBLIC NUISANCE

o2 Illinois courts have adopted the Restatement (Second) of Torts' definition of public nuisance. *Wheat v. Freeman Coal Mining Corp.*, 23 Ill. App. 3d 14, 18, 319 N.E.2d 290 (1974); *City of Chicago v. Commonwealth Edison Co.*, 24 Ill. App. 3d 624, 631, 321 N.E.2d 412 (1974). Section 821B of the Restatement (Second) of Torts defines a public nuisance as "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B (1979). Unlike an individual right, a public right is collective in nature and is common to all members of the general public. However, it is not neces-

sary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large. Restatement (Second) of Torts § 821B, Comment *g* (1979). A private individual may bring a public nuisance action if he suffers damages distinct from those suffered by the public at large. Restatement (Second) of Torts § 821C (1979); *David H. Swain & Son v. Chicago, Burlington & Quincy R.R. Co.*, 252 Ill. 622, 626, 97 N.E. 247 (1911).

■ A sufficient pleading for a public nuisance cause of action consists of facts alleging a right common to the general public, a transgression of those rights by the defendant and resulting damages. *Feder v. Perry Coal Co.*, 279 Ill. App. 314, 318 (1935); *Gilmore*, 261 Ill. App. 3d at 661. Pleading requirements are not strenuous because common law public nuisance eludes precise definition and depends on the peculiar facts of each case. *Gilmore*, 261 Ill. App. 3d at 661, citing *City of Chicago v. Festival Theatre Corp.*, 91 Ill. 2d 295, 438 N.E.2d 159 (1982), and *Commonwealth Edison*, 24 Ill. App. 3d 624, 321 N.E.2d 412.

## A. PUBLIC RIGHT

■ The first element that a plaintiff must allege in order to state a claim for public nuisance is the existence of "a right common to the general public." *Commonwealth Edison Co.*, 24 Ill. App. 3d at 631. Rights of the general public entitled to protection include the right to "the public health, the public safety, the public peace, the public comfort or the public convenience." Restatement (Second) of Torts § 821B(2)(a) (1979) (common law public nuisances include interference with public safety, like shooting off fireworks in the public streets, or interference with public convenience, as by obstruction of a public highway).

■ Here, plaintiffs allege "the rights of plaintiffs and others to use the streets and public ways without fear, apprehension and injury." In support, plaintiffs rely upon *Village of Des Plaines v. Poyer*, 123 Ill. 348, 14 N.E. 677 (1888), for the origin of this right. In *Poyer*, the Illinois Supreme Court was called upon to decide the validity of a village ordinance. The ordinance declared public picnics and open air dances to be a public nuisance. The court indicated that nothing in the nature of public picnics and open air dances was necessarily harmful. The court conceded that public dances and picnics could perhaps lead to annoyance and injury to the public. However, the court reasoned that the ordinance should then be directed to "the right of the people to be free from disturbance and reasonable apprehension of danger to person

and property." *Poyer*, 123 Ill. at 351. According to the court, this right "is to be respected and jealously guarded." *Poyer*, 123 Ill. at 351. Accord *Bubalo v. Navegar*, No. 96 C 3664 (N.D. Ill. March 20, 1998). In our view, plaintiffs' allegations sufficiently plead the right of the people to be free from disturbance and reasonable apprehension of danger to person and property.

## B. UNREASONABLE INTERFERENCE

■ According to comment *e*, section 821B of the Restatement (Second) of Torts, an unreasonable interference need not be negligent. Rather, intentional misconduct by the defendant can also give rise to liability for public nuisance.

> "[T]he defendant is held liable for a public nuisance if his interference with the public right was intentional or was unintentional and otherwise actionable under the principles controlling liability for negligent or reckless conduct or for abnormally dangerous activities. *** If the interference with the public right is intentional, it must also be unreasonable." Restatement (Second) of Torts § 821B, Comment *e* (1979).

The Restatement further defines what constitutes an "intentional" invasion as follows:

> "An invasion of another's interest in the use and enjoyment of land or an interference with the public right, is intentional if the actor
>
> (a) acts for the purpose of causing it, or
>
> (b) knows that it is resulting or is substantially certain to result from his conduct." Restatement (Second) of Torts § 825 (1979).

■ Finally, the Restatement sets forth the following circumstances that may sustain a holding that an interference with a public right is "unreasonable":

> "(a) Whether the conduct involves significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>
> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
>
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." Restatement (Second) of Torts § 821B(2) (1979).

Comment *e* explains that the three circumstances listed above are not intended as exclusive tests for determining unreasonableness. Also, the unreasonableness of the defendants' actions that led to the determination of nuisance is a question of fact for the jury. *Gilmore*, 261 Ill. App. 3d at 661, citing *Belmar Drive-In Theatre Co. v. Illinois State Toll Highway Comm'n*, 34 Ill. 2d 544, 216 N.E.2d 788 (1966).

■ In the instant case, plaintiffs allege that defendants designed and marketed weapons targeting criminals; distributed firearms through a market structure intentionally created by defendants by relying on low-end retailers who encourage purchasers to illegally transport weapons to Chicago; failed to regulate or discipline known irresponsible dealers; flooded the market in areas surrounding Chicago, knowing and foreseeing that excess firearm supply would be taken to Chicago and possessed and used illegally; and intentionally created and maintained an underground market for handguns. In our view, the complaints sufficiently allege that the defendants' actions were intentional. The complaints also allege two of the "unreasonableness" factors: the alleged conduct significantly affects public safety, and the conduct has caused plaintiffs permanent damages.

Defendants cite *Abell v. First National Bank in Shawneetown*, 153 Ill. App. 3d 946, 506 N.E.2d 684 (1987), to argue that generalized assertions that all defendants have intentionally engaged in unspecified misconduct are not enough under the law. However, *Abell* involved a conspiracy-to-defraud claim and not public nuisance. In *Abell*, the court indicated that the plaintiffs' evidence regarding defendants' intent to defraud fell short of "substantial certainty." *Abell* was also decided at the summary judgment phase of litigation. In contrast, here, the plaintiffs need only plead ultimate facts regarding defendants' intent to survive a motion to dismiss. *Gilmore*, 261 Ill. App. 3d at 654 ("a pleader is not required to set out his evidence but only the ultimate facts to be proved").

Defendants present a series of arguments to claim that their alleged conduct does not constitute an unreasonable interference with a public right.

### 1. No Liability for Criminal Misuse of Product

First, defendants rely on *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984), *Linton v. Smith & Wesson*, 127 Ill. App. 3d 676, 469 N.E.2d 339 (1984), and *Riordan v. International Armament Corp.*, 132 Ill. App. 3d 642, 477 N.E.2d 1293 (1985), to argue that Illinois law rejects the imposition of any tort liability, including public nuisance, on firearm manufacturers and distributors for the criminal misuse of their products. However, neither *Martin*, *Linton* nor *Riordan* involved public nuisance claims.

The plaintiffs in *Martin* alleged that manufacturing and selling handguns to the public was an ultrahazardous activity that gave rise to strict liability for any damage done by the guns. *Martin*, 743 F.2d at 1201-02. The court noted that Illinois law limited strict liability for

the sale of a product to unreasonably dangerous defective products. *Martin*, 743 F.2d at 1204. Since the handgun involved in the shooting posed an obvious danger that required no warning, the court found that it was not unreasonably dangerous. There were also no allegations that the gun was defective. *Martin*, 743 F.2d at 1202-03. The court concluded that the plaintiffs had no grounds for recovery under the doctrine of strict liability for engaging in ultrahazardous activities. *Martin*, 743 F.2d at 1204.

In *Linton*, the plaintiff alleged that a gun manufacturer was liable for negligent and wilful and wanton distribution of the gun used to shoot the plaintiff. The plaintiff claimed that the gun manufacturer had a duty to prevent the sale of its guns to persons who were likely to cause harm to the public. *Linton*, 127 Ill. App. 3d at 677-78. The court disagreed, holding that the manufacturer of a nondefective firearm had no duty to control the distribution of the product to the general public. The court reasoned that, unlike small children, the general public did not lack the judgment, discretion and experience to use such a product safely. *Linton*, 127 Ill. App. 3d at 678.

Similarly, *Riordan* rejected a claim identical to the plaintiff's in *Linton*—that handgun manufacturers and distributors owed a duty to control the distribution of their products based upon allegations of negligent and wilful and wanton distribution. The court, citing *Linton*, found that a duty did not arise because criminal misuse of the product was not a foreseeable consequence of sales to the general public. *Riordan* also rejected plaintiffs' claim that the defendants negligently failed to warn consumers of the danger of handguns and the illegality of carrying concealed weapons. The court held that no duty to warn arose as the dangers of illegal handgun misuse were obvious and open conditions that a reasonable consumer would realize.

*Riordan* further dismissed plaintiffs' two claims for strict liability: (1) that manufacturing and marketing of handguns to the public constituted an ultrahazardous or abnormally dangerous activity; and (2) that handguns were defectively designed in that they were small, relatively cheap and easily concealable without serving a useful social purpose. *Riordan*, 132 Ill. App. 3d at 645, 648-49. Following *Martin*, *Riordan* held that it was not the manufacture and sale of handguns that was ultrahazardous, but their use or misuse alleged in plaintiffs' complaints. *Riordan*, 132 Ill. App. 3d at 649. *Riordan* further stated that strict liability for a "defective condition" is a condition not contemplated by the ordinary consumer. *Riordan*, 132 Ill. App. 3d at 649-50. Since the alleged design defects of size and concealability were not conditions that caused the handgun to fail to perform in a reasonably expected manner, *Riordan* held that the plaintiffs could not re-

cover under strict liability for defective design. *Riordan*, 132 Ill. App. 3d at 650-51.

●9 Unlike the plaintiffs in *Martin*, *Linton* and *Riordan*, the plaintiffs here do not allege that defendants are liable under theories of negligence or strict liability. Rather, their public nuisance claims allege *intentional* and unreasonable conduct on the part of the defendants. Indeed, a public nuisance claim may be predicated on intentional interference with a public right. See Restatement (Second) of Torts § 821B, Comment *e* (1979). Thus, the analysis in those cases is inapplicable to the case at bar. For the same reason, we find inapposite the following strict liability and negligence cases cited by defendants which do not present public nuisance claims: *Miller v. Civil Constructors, Inc.*, 272 Ill. App. 3d 263, 651 N.E.2d 239 (1995) (discharge of firearms was not ultrahazardous activity such that target shooters were strictly liable for bystander's injuries); *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 750 N.E.2d 1055, 727 N.Y.S.2d 7 (2001) (negligence claims by survivors of persons killed through criminal use of illegally obtained handguns failed to allege that handgun manufacturers owed a duty to exercise reasonable care in the marketing and distribution of their product).

## 2. Public Nuisance Inapplicable to Products

Next, defendants cite two federal cases from Illinois to assert that public nuisance law does not apply to the lawful, commercial distribution of a product: *Bubalo v. Navegar, Inc.*, No. 96 C 3664 (N.D. Ill. March 20, 1998) (*Bubalo II*), and *City of Bloomington, Indiana v. Westinghouse Electric Corp.*, 891 F.2d 611 (7th Cir. 1989). *Bubalo II*, a federal district court case, is noteworthy as it is the only public nuisance case against handgun manufacturers and distributors that has been decided in Illinois.[1] The issue before us is an issue of first impression in an Illinois state court.

*Bubalo II* involved a public nuisance action brought on behalf of two police officers who were shot in the line of duty. Defendant Navegar manufactured the 9-millimeter semi-automatic pistol used in the shootings. *Bubalo v. Navegar*, No. 96 C 3664 (N.D. Ill. June 13, 1997) (*Bubalo I*). Plaintiffs alleged that the design and marketing of these powerful assault weapons were targeted to appeal to criminals. In ad-

---

[1]The parties also cite a recent circuit court decision, City of Chicago v. Beretta U.S.A. Corp., No. 98 CH 015596 (Cir. Ct. Cook County September 15, 2000), in which Judge Schiller dismissed a public nuisance complaint brought by the City of Chicago against handgun manufacturers and distributors. This case is currently pending on appeal before this court and, therefore, will not be considered.

dressing defendant's argument that manufacturers of nondefective, legal products could not be liable for public nuisance, *Bubalo II* examined the Seventh Circuit's decision in *City of Bloomington*.

In *City of Bloomington*, Monsanto Company (Monsanto) manufactured polychlorinated biphenyls (PCBs) and sold them to Westinghouse Electric Corporation (Westinghouse). The city sued Monsanto and Westinghouse for public and private nuisance, alleging that Westinghouse discharged waste containing PCBs that contaminated the city's landfill, sewer system and sewage treatment plant.

In assessing Monsanto's liability, the court indicated that it was unable to find any authority holding manufacturers liable for public or private nuisance claims arising from the use of their product subsequent to the point of sale. The court focused on the fact that Monsanto could not be held liable on a nuisance theory because no facts were alleged stating that Monsanto retained the right to "control" the PCBs beyond the point of sale. *City of Bloomington*, 891 F.2d at 614.

The court also emphasized that when alerted to the risks associated with PCBs, "Monsanto made every effort to have Westinghouse dispose of the chemicals safely." *City of Bloomington*, 891 F.2d at 614. According to the court, there were no allegations to support the notion that Monsanto participated in carrying on the nuisance. The court cited section 834 of the Restatement (Second) of Torts for support:

> "One is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." *City of Bloomington*, 891 F.2d at 614 n.5, citing Restatement (Second) of Torts § 834 (1979).

The court concluded that without allegations of such participation, the nuisance claims were properly dismissed. *City of Bloomington*, 891 F.2d at 614.

In its analysis of *City of Bloomington*, *Bubalo II* highlighted that Monsanto made every effort to have Westinghouse dispose of the chemicals safely. However, according to *Bubalo II*, if Monsanto had intentionally marketed the product knowing that its customers would dispose of it in a harmful manner, nothing would preclude liability in those circumstances.

> "Suppose, however, that Monsanto *** intentionally marketed the product to customers who it knew or should have known would dispose of PCB's in a manner that would harm the environment. Nothing in the opinion in *City of Bloomington* would preclude the imposition of liability on the manufacturer under those facts." *Bubalo II*, slip op. at 4.

*Bubalo II* then remarked that, unlike *City of Bloomington*, plaintiffs make a "serious and disturbing" allegation that the defendants designed and marketed powerful assault weapons targeted to appeal to criminals. This allegation, if true, suggested a degree of participation not present in *City of Bloomington* and "within the meaning of [the] phrase ['to a substantial extent'] in the *Restatement* § 834." *Bubalo II*, slip op. at 4-5. As a federal court deciding a case of first impression under Illinois nuisance law, *Bubalo II* stated that it was reluctant to impose liability under Illinois law without more guidance or "solid foundation in the state decisional law." *Bubalo*, slip op. at 4.

Similar to the plaintiffs in *Bubalo II*, the plaintiffs here allege that defendants designed and marketed weapons targeting juveniles and criminals. Also, the plaintiffs' allegations in this case describe even further participation by the defendants: (1) distribution of firearms through a market structure intentionally created and maintained by defendants by relying on low-end retailers which encourage purchasers to illegally transport weapons to Chicago; (2) failure to regulate or discipline known irresponsible dealers; and (3) market saturation of areas surrounding Chicago, knowing and foreseeing that excess firearm supply will be taken to Chicago and possessed and used illegally. In our view, the complaints allege participation "to a substantial extent" within the meaning of the phrase in section 834 of the Restatement.

Defendants cite cases outside Illinois that dismissed public nuisance claims against firearm manufacturers and distributors. The cited cases include: *Camden County Board of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245 (D.N.J. 2000) (*Camden I*), aff'd, 273 F.3d 536 (3d Cir. 2001) (*Camden II*); *City of Philadelphia v. Beretta U.S.A. Corp.*, 126 F. Supp. 2d 882 (E.D. Pa. 2000); and *City of Cincinnati v. Beretta U.S.A. Corp.*, Nos. C—990729, C—990814, C—990815 (Ohio App. August 11, 2000). An examination of these cases reveals a general trend in the way courts nationwide have approached the issue of whether to recognize a public nuisance action involving a nondefective product, specifically a handgun. There appears to be a correlation between the degree of mental culpability associated with a defendant's (manufacturer, distributor or dealer) alleged conduct and whether a public nuisance claim is permitted to proceed. In these cases, allegations falling short of intentional creation and propagation of an illegal underground gun market, such as negligence, recklessness, awareness or knowledge that guns flow into an illegal market, have not succeeded.

*City of Cincinnati*[2] and *City of Philadelphia*[3] generally alleged "awareness" or "knowledge" by the defendants that their marketing and distribution allowed guns to be possessed and used illegally; however, they chose not to do anything about it. *City of Cincinnati* held that a lawful activity could not constitute a public nuisance and dismissed the claim. *City of Cincinnati*, slip op. at ___. *City of Philadelphia* found that there was no precedent to apply public nuisance law to the design and distribution of a product. *City of Philadelphia*, 126 F. Supp. 2d at 908. The court also rejected the claim on the following bases: defendant's acts were lawful; third-party criminal actions were the cause; defendants exercised no control over the product after its sale; and there existed no public right to be free from guns. *City of Philadelphia*, 126 F. Supp. 2d at 909-11.

In *Camden I*, the complaint alleged that the defendants created a criminal market for handguns by implementing marketing and distribution policies that made it easy for criminals to access guns. *Camden I*, 123 F. Supp. at 266. Significantly, the New Jersey district court indicated that there were no allegations that the defendants endorsed or condoned the criminal gun market. The court reasoned that, without such allegations, it could not be said that the defendants substantially participated in creating the nuisance and had the power to control it. Due to this pleading defect, the district court concluded that the complaint failed to state an actionable claim for public nuisance. *Camden I*, 123 F. Supp. at 267. The Third Circuit Court of Appeals affirmed, holding that the defendant manufacturers' lawful distribution of handguns did not constitute a public nuisance under New Jersey law. *Camden II* explained that the complaint failed to allege that defendants exercised sufficient control over the source of the interference with the public right, namely criminals with guns. *Camden II*, 273 F.3d at 541.

In the instant case, the complaints are filed on behalf of persons who were killed by teenage gang members. Plaintiffs have alleged that defendants *intentionally* created and maintained an illegal secondary gun market, thereby creating and carrying on a public nuisance. Specifically, the complaints allege that the defendants have

---

[2] Allegations included intentional and reckless marketing, distribution and sales of guns knowing they would be possessed and used illegally. *City of Cincinnati*, slip op. at ___.

[3] Alleged that marketing scheme was designed to appeal to children; that manufacturers knew distribution channels allowed guns to fall into hands of criminals and youth; and manufacturers knew which dealers engaged in straw purchases but failed to monitor or supervise them. *City of Philadelphia*, 126 F. Supp. 2d at 888.

"created and maintained this market structure knowing and intending this result." In our view, contrary to defendant's claims that they have no power to abate the nuisance due to lack of control, the complaints connote that defendants have the power to control the purposeful creation and maintenance of an illegal secondary market by oversupplying the areas around Chicago with handguns.

Additionally, defendants' reliance upon cases rejecting public nuisance liability for the sale of defective products is misplaced. See *Levit v. General Motors Corp.*, 682 F. Supp. 386 (N.D. Ill. 1988) (public nuisance law was inapplicable in a products liability case against manufacturer of refrigerator that suddenly burst into flames); *Tioga Public School District v. United States Gypsum Co.*, 984 F.2d 915 (8th Cir. 1993) (nuisance law does not afford remedy against manufacturer of asbestos-containing material to an owner whose building was contaminated following installation of that product, because defendant lacked control of the product after sale); *Detroit Board of Education v. Celotex Corp.*, 196 Mich. App. 694, 493 N.W.2d 513 (1992) (same). Unlike the allegations of intentional creation of a public nuisance presented here, *Levit*, *Tioga*, and *Detroit Board* involved an individual consumer's tort remedy for the negligent sale of a *defective* product.

### 3. Public Nuisance Inapplicable to Lawful Acts

Third, defendants contend that common law public nuisance actions traditionally arise in only two circumstances: (1) where the alleged nuisance is connected to real property; or (2) where the purported nuisance violates a statute or ordinance. Defendants further posit that their actions in manufacturing, marketing, or distributing handguns complied with federal, state and local laws related to firearms and, therefore, a nuisance action is foreclosed.

■ Contrary to defendants' contentions, a public nuisance need not involve real property. "Unlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land." Restatement (Second) of Torts § 821B, Comment *h* (1979). Common law public nuisance is also "not limited to those activities the legislature has declared [to be] public nuisances." *Festival Theatre*, 91 Ill. 2d at 303.

Defendants rely upon isolated *dicta* from a private nuisance case for the proposition that "a lawful act will not constitute a public nuisance." *Meyers v. Kissner*, 149 Ill. 2d 1, 10, 594 N.E.2d 336 (1992). However, public nuisance cases have held that compliance with the law is not dispositive and merely serves as a "guideline" in determining whether an unreasonable interference has occurred. *Commonwealth Edison*, 24 Ill. App. 3d at 632-33. "Handgun manufactur-

ers, like the rest of us, can be held civilly liable for their conduct even if it falls within the framework and regulations of statutory law." D. Kairys, *The Governmental Handgun Cases and the Elements and Underlying Policies of Public Nuisance Law*, 32 Conn. L. Rev. 1175, 1182 (Summer 2000). As the Restatement points out: "[T]raveling at less than the speed limit may still be negligence if traffic conditions indicate a lesser speed is required." Restatement (Second) of Torts § 821B, Comment *f* (1979). In the instant case, plaintiffs contend that defendants' intentional creation and perpetuation of an illegal, secondary handgun market that caters to juveniles cannot be properly characterized as a "lawful act."

■ Defendants also cite several federal, state and local regulatory provisions, arguing that civil liability for public nuisance is foreclosed due to a comprehensive set of legislative acts and administrative regulations governing the details of firearm sales and distribution. See 18 U.S.C. § 921 *et seq.* (1994); 18 U.S.C. § 922 *et seq.* (1994); 27 C.F.R. Pt. 178 (1998); 430 ILCS 65/2 through 4 (West 1998); 720 ILCS 5/24—3 (West 1998); Chicago Municipal Code §§ 4—144—060 (eff. December 9, 1992), 4—144—070 (eff. December 9, 1992), 8—20—010 (amended July 7, 1992), 8—20—030 (amended March 10, 1999), 8—20—040 (amended July 7, 1992); the Cook County Deadly Weapons Dealer Control Ordinance (app. November 3, 1999).

It is certainly true that comprehensive legislation of a certain activity causes courts to exercise judicial restraint in declaring an activity to be a public nuisance if it complies with the regulations. Restatement (Second) of Torts § 821B, Comment *f* (1979). "However, there is generally no regulation of the quantity, frequency, or purpose of firearm purchases or sales nor is there any national registration of purchasers of firearms. Multiple sales and even straw purchases are generally not unlawful and are not significantly regulated." D. Kairys, *The Governmental Handgun Cases and the Elements and Underlying Policies of Public Nuisance Law*, 32 Conn. L. Rev. 1175, 1183 (Summer 2000).[4] The preamble to the Cook County Deadly Weapons Dealer Control Ordinance (app. November 3, 1999) echoes the lack of comprehensive regulation of guns in Chicago:

> "WHEREAS, current state law contains gaping loop holes and unacceptable provisions that allow dangerous and unchecked transfers of guns at gun shows and multiple sales to straw purchasers who transfer guns to criminals and youth." Cook County Deadly Weapons Dealer Control Ordinance (app. November 3, 1999).

---

[4]A few states like Illinois have adopted a "one gun a month" law. Cook County Deadly Weapons Dealer Control Ordinance, § 4—1(4)(xi) (app. November 3, 1999).

Thus, without comprehensive legislation in certain areas related to gun marketing, sales and distribution, we disagree with defendants that existing firearm regulations foreclose civil liability for creating a public nuisance.

### 4. Wrongful Death

Lastly, we address the contention of defendant reseller Breit & Johnson Sporting Goods, Inc. (B&J), that plaintiff Young is really attempting to assert a wrongful death claim against B&J, and not a public nuisance claim. In support, B&J argues that count VII of Young's complaint seeks monetary damages pursuant to the Illinois Wrongful Death Act (740 ILCS 180/1 *et seq.* (1998)) and does not request injunctive relief. B&J further posits that plaintiff does not complain about the violation of a public right, but only "about the fact that his son was tragically murdered." According to B&J, the allegations by Young are simply claims of negligence which were already dismissed by the trial court in count VI. We disagree.

First, we note that a plaintiff may seek monetary damages as well as injunctive relief in a public nuisance action:

> "In determining whether to award damages [for public nuisance], the court's task is to decide whether it is unreasonable to engage in the conduct without paying for the harm done. Although a general activity may have great utility it may still be unreasonable to inflict the harm without compensating for it." Restatement (Second) of Torts § 821B, Comment *i* (1979).

Thus, the fact that Young seeks monetary relief does not abrogate his public nuisance claim.

Next, we disagree with B&J's contention that Young is only suing for the murder of his son and not a violation of a public right. Count VII against B&J incorporates the previous allegations set forth in the complaint, including the claim that B&J interfered with plaintiff's public right to use the "public spaces of the City of Chicago without undue risk of injury to themselves and to their families." Furthermore, count VII contains more than allegations of mere negligence: B&J allegedly substantially participated in the creation of a public nuisance by conducting illegal sales of handguns to persons it knew or reasonably should have known would either use or transfer the gun to another who would use it in a violent or illegal manner. Specifically, the complaint alleges that B&J had reason to suspect that Mariano DiVittorio was a gun trafficker whom B&J "knows or reasonably should know will illegally transfer or resell the handguns," but sold him the Bryco 59 used to kill Andrew Young despite this knowledge. Unlike count VI, grounded in negligence, count VII alleges a heightened awareness on the part of the defendant gun dealer. In

our view, Young's pleadings sufficiently set forth a public nuisance cause of action against B&J.

## C. RESULTING INJURY

The parties do not dispute that the plaintiffs have suffered an injury resulting from the murders of their family members. Rather, defendants argue that the complaints should have been dismissed because they do not assert facts capable of establishing the necessary element of proximate cause as a matter of law.

■ According to the Restatement, liability for either public or private nuisance arises because one person's acts set in motion a force or chain of events resulting in the invasion or interference. The acts may be a direct and immediate cause or an indirect cause of the interference. Restatement (Second) of Torts § 824, Comment *b* (1979). Legal causation is essentially a question of foreseeability. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 258, 720 N.E.2d 1068 (1999). In the special case where plaintiff's injuries result not from defendant's direct actions, but from the subsequent, independent act of a third person, the issue of legal causation becomes the following: whether the intervening cause is of the type that a reasonable person would see as a likely result of his conduct. *Galman*, 188 Ill. 2d at 258.

■ The defendants rely on *Martin*, which held that criminal misuse of a handgun is not a foreseeable consequence of gun manufacturing. *Martin*, 743 F.2d at 1205. According to the defendants, this unforeseeable, intervening cause similarly breaks the causal connection between the defendants' actions and the subsequent injuries, relieving them of liability. We disagree.

Unlike *Martin*, the complaints in the instant case contain much more than allegations of mere gun manufacturing. The defendants here allegedly intentionally created and maintained an underground market of firearms and deliberately designed, marketed, and sold guns that were targeted to appeal to criminals. In our view, a reasonable trier of fact could find that the criminal misuse of guns killing persons were occurrences that defendants knew would result or were substantially certain to result from the defendants' alleged conduct in the instant case.

## III. STANDING

Lastly, defendants argue that plaintiffs, as private individuals, must clear an additional hurdle in a public nuisance action by alleging a special, distinct injury that is not suffered by the community at large. Defendants maintain that this additional requirement raises issues of lack of standing with respect to certain parties. Defendants

challenge the plaintiffs' standing on two bases: (1) all plaintiffs lack standing to sue the "unrelated defendants"—a term coined by defendants to refer to those who did not manufacture or distribute the particular handguns used to kill plaintiffs' decedents; and (2) plaintiffs Macias and Bowman, who could not identify the specific firearm used in the killings, lack standing altogether and must be dismissed from the suit.

■ Generally, for a party to have standing based on injury in fact to a legally cognizable interest, the claimed injury must be: (1) distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief. *Glisson v. City of Marion*, 188 Ill. 2d 211, 221, 720 N.E.2d 1034 (1999). Additionally, a private individual may institute a public nuisance action only if he suffers a special and particular injury distinct from that suffered by the public at large. In cases where no special or private injury is caused to an individual, an action must be instituted by or in the name of the public. *Hoyt v. McLaughlin*, 250 Ill. 442, 447, 95 N.E. 464 (1911).

In the instant case, defendants concede that all five plaintiffs have suffered a distinct injury in that their family members were killed. However, defendants argue that this distinct injury is not "directly traceable" to the unrelated defendants who did not manufacture, distribute or sell a gun identified in any of the killings.

In response, plaintiffs cite *Cook v. City of Du Quoin*, 256 Ill. App. 452 (1930), a case relied upon by the trial court in its holding that plaintiffs had standing to sue the "unrelated defendants." In *Cook*, the plaintiff farm owner sued the city for creating a public nuisance. The city constructed a sewer system, which discharged sewage into a creek that flowed across plaintiffs' land. The creek became contaminated and could no longer be used by plaintiff to water his stock. In defense, the city argued that it was not the sole source of pollution and that other towns and villages may have been responsible for contributing to the pollution of the creek. The court rejected this defense, stating:

> "Where the acts of several persons, although separate and distinct as to time and place, culminate in producing a public nuisance, which injures the person or property of another, they are jointly and severally liable." *Cook*, 256 Ill. App. at 456.

■ The water pollution in *Cook* resulted from fungible ingredients. As a result, we find *Cook* to be distinguishable from the instant case. In *Cook*, there was no dispute that the city contributed to the pollution of the creek to some extent. Even if other sources contributed to the contamination of the creek, it would be difficult to identify whose

contamination affected which droplet of water that flowed across plaintiff's land and caused him injury. Here, in contrast, it is possible to isolate and identify the source of the firearm that killed plaintiff's decedents. See *Yeazel v. Alexander*, 58 Ill. 254, 262 (1871) (" 'If, in legal consideration, the act complained of could not have been committed by several persons, and can only be considered the tort of the actual aggressor, or the distinct tort of each, a separate action against the actual wrong-doer only, or against each, must be brought.' [Citation]"). Thus, plaintiffs lack standing to assert a public nuisance claim against the "unrelated defendants" who did not manufacture, distribute or sell the firearms in question.

Furthermore, we are not persuaded by the trial court's reasoning that plaintiffs Macias and Bowman have standing to sue despite the fact that they are unable to identify the guns that caused the deaths. According to the trial court:

> "The Plaintiffs are not claiming \*\*\* that one particular gun caused the Plaintiffs' injuries. Instead, the Plaintiffs are claiming that the Defendants, as a whole, have caused guns to become readily available to both juveniles and criminally oriented individuals within the City of Chicago. As a result, Plaintiffs contend, Defendants have caused a saturation of guns in the City of Chicago and said guns have allegedly caused the death of Plaintiffs' decedents."

However, in order for a private litigant to successfully plead public nuisance, he must allege a distinct injury (in this case the victim's death) which is "fairly traceable" to the defendant's conduct. *Glisson*, 188 Ill. 2d at 221. In our view, the gun is inextricably tied to the victims' injuries and is also subject to identification. We conclude that plaintiffs Macias and Bowman have failed to allege that their distinct injuries are "fairly traceable" to the defendants' conduct in the instant case.

In conclusion, we respond to the certified question presented for immediate appeal under Illinois Supreme Court Rule 308 (155 Ill. 2d R. 308) as follows:

1. Plaintiffs' fifth amended complaint in *Young v. Bryco Arms* states a viable public nuisance cause of action under Illinois law with respect to counts I and VII of the complaint. Plaintiffs Young and Macias lack standing to assert a public nuisance cause of action against the defendants with respect to count II. Accordingly, as to the fifth amended complaint in *Young v. Bryco Arms*, we answer the certified question yes as to counts I and VII and no as to count II.

2. Plaintiffs' third amended complaint in *Smith v. Navegar, Inc.* states a viable public nuisance cause of action under Illinois law with respect to count I of the complaint. Plaintiffs Smith and Bowman lack

standing to assert a public nuisance cause of action against the defendants with respect to count II. Accordingly, as to the third amended complaint in *Smith v. Navegar, Inc.*, we answer the certified question yes as to count I and no as to count II.

3. Plaintiffs' third amended complaint in *Ceriale v. Smith & Wesson Corp.* states a viable public nuisance cause of action under Illinois law with respect to counts I and VII of the complaint. Plaintiff Ceriale lacks standing to assert a public nuisance cause of action against the defendants with respect to count II. Accordingly, as to the third amended complaint in *Ceriale v. Smith & Wesson Corp.*, we answer the certified question yes as to counts I and VII and no as to count II.

Certified question answered.

McNULTY and TULLY, JJ., concur.